**UNITED TRANSPORTATION UNION, PENNSYLVANIA STATE LEGISLATIVE BOARD, Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 12, 2013.

Decided May 20, 2013.

---

Lawrence M. Mann, Bethesda, MD, for petitioner.

John E. Herzog, Assistant Counsel, Harrisburg, for respondent.

John F. Povilaitis, Harrisburg, and Joseph P. Sirbak, II, Philadelphia, for intervenor Norfolk Southern Railway Company.

BEFORE: PELLEGRINI, President Judge, and SIMPSON, Judge (P.), and COLINS, Senior Judge.

OPINION BY Judge SIMPSON.

This appeal involves a 1975 order issued by the Public Utility Commission (PUC) that requires Norfolk Southern Railway Corporation (Norfolk Southern) to employ two brakemen around the clock to prevent "run outs"[1] of rail cars. We are asked whether the 1975 order is preempted by the Federal Railroad Safety Act of 1970, 49 U.S.C. §§ 20101–20167, (FRSA), and Federal Railroad Administration (FRA) regulations. The Pennsylvania State Legislative Board of the United Transportation Union (Union) contends the 1975 order does not cover the same subject as federal law and remains necessary to ensure safety. On cross motions for summary judgment, the PUC agreed with Norfolk Southern and concluded its 1975 order is preempted. The Union appealed, arguing preemption does not apply. Upon review, we affirm.

## I. Background

The PUC's order of June 12, 1975, is designed to prevent "run outs" in the 400 and 500 classification tracks of Conway Yard (Yard) in Beaver County (1975 Order). Norfolk Southern contends the 1975 Order is outdated because run outs are virtually eliminated by more modern methods, like hydraulic skates, which do not require designated brakemen to weave amongst rail cars placing and removing portable skates.[2] That requirement poses a significant safety hazard.

### A. Relevant Railroad Operations

The Yard is a "hump" classification yard containing 53 classification tracks of varied lengths, running in eastbound and westbound directions. Reproduced Record (R.R.) at 212a, 452a. The primary operation of the Yard is the classification of rail cars by shoving them to the apex of an incline (the hump), and separating the cars into a "cut" of one to four cars before their descent. R.R. at 18a. This allows the cars, propelled by gravity and controlled by a series of retarders, to travel down the hump and onto an assigned classification track. Then the rail cars are coupled with those already on the track and moved to ultimately create trains.

Railroads use different brake systems to control the rail cars' speed. Inert retarders are permanently installed on the rails after the hump to squeeze a rail car's wheels, causing it to stop. See R.R. at 19a, 49a. Railroads also use computer operated hydraulic skates. Norfolk Southern installed automated hydraulic brakes to eliminate the need for "skatemen" to apply and remove portable skates.

### B. 1975 Order

The 1975 Order required the railroad to assign two skatemen to monitor the west end of the classification tracks for the exclusive purpose of preventing run outs. The skatemen placed portable skates on the rails of the classification tracks beyond the inert retarders as back-up devices to slow and stop the rail cars.

The 1975 Order is the result of a complaint filed by a committee of unions which alleged the railroad's (then Penn Central) ineffective braking systems resulted in hazardous conditions for railroad employees by allowing run outs. The unions asserted that ineffective inert retarders and

---

1. A "run out" occurs where rail cars travel beyond a designated clearance point at the end of the classification, and may "foul," or run onto, adjacent tracks and collide with other rail cars.

2. "Skates" are wedges of steel fitted on top of the rails which dig in between the rails and wheels. The skates slide with the rail car, which creates friction and stops most cars. See Reproduced Record (R.R.) at 49a.

skates, combined with the railroad's failure to require application of hand brakes on individual rail cars, failed to adequately protect against run outs. Essentially, the 1975 Order memorializes the agreement between the parties to address the run out problem.

In response to an application of the Union regarding alleged noncompliance with the 1975 Order, the PUC issued another order dated May 6, 1998 (1998 Order) clarifying the requirements of the 1975 Order. After finding that skatemen spent five hours of their eight-hour shift sitting in the Yard Office, which is located a "considerable distance" from where the skates are placed, the PUC confirmed that the railroad may assign the two designated skatemen to other duties while not engaged in preventing run outs. *See* 1998 Order; R.R. at 148a.

### C. Procedural History

In 2009, Norfolk Southern petitioned the PUC for rescission or amendment of the 1975 Order, arguing the relief it required is outdated and inappropriate given the conditions in the Yard. In its petition, Norfolk Southern asked the PUC to amend the 1975 Order to: (1) eliminate portable skates; and (2) eliminate the requirement to use skatemen for that job. Alternatively, Norfolk Southern asked the PUC to amend the 1975 Order so it may direct *any* employee to apply or remove portable skates, and reassign the skatemen to other positions.

Subsequently, in an amendment to its petition, Norfolk Southern advised it implemented engineering and safety improvements in the Yard that have virtually eliminated run outs since the PUC last reviewed the 1975 Order. Norfolk South-ern began replacing inert retarders with automated hydraulic skates in Spring 2010, discontinuing the use of portable skates on tracks equipped with hydraulic skates. Norfolk Southern finished installing hydraulic skates on 500 classification tracks in June 2011. It maintains the use of portable skates creates a safety hazard because personnel walk between the tracks and under rail cars in order to place portable skates.

The Union filed comments opposing Norfolk Southern's petition, contending portable skates remain necessary to prevent run outs. The Union contends that Norfolk Southern's installation of hydraulic skates did not increase safety, and were not more effective for run out prevention. The matter was referred to an administrative law judge (ALJ) for hearing and issuance of a recommended decision.

In October 2011, the Union also filed a separate petition with the PUC seeking emergency relief (Emergency Petition). In its Emergency Petition, the Union alleged that a number of recent run out incidents in the Yard resulted in collisions between rail cars and in employee injuries. The Union asked the PUC to direct Norfolk Southern to do the following: (1) mandate the use of portable skates; (2) allow employees to mount moving equipment for safety purposes; (3) require retarders to be attended by retarder operators; (4) remove obstructions[3] in the walkways between tracks; (5) enjoin Norfolk Southern from violating PUC orders; (6) impose civil penalties; and, (7) award counsel fees and costs to the Union.

The ALJ held an emergency hearing on the Union's Emergency Petition, at which both Norfolk Southern and the Union presented testimony,[4] before denying relief.

---

3. The "obstructions" to which the Union refers are the housings for the hydraulic skates.

4. The ALJ used the evidence compiled in the hearing on the Emergency Petition as the

The ALJ certified a material question of the correctness of denying interim emergency relief to the PUC. In an order dated December 1, 2011, the PUC upheld the ALJ's order and referred the matter for further proceedings.

Subsequently, on December 23, 2011, the PUC issued a Secretarial Letter advising that Norfolk Southern raised the issue of federal preemption, which would obviate the need for further proceedings. The Secretarial Letter directed the ALJ to address whether the 1975 Order is preempted by federal law. The PUC advised the ALJ to address the preemption issue preliminarily at the outset, and limited further proceedings to preemption in the interest of adjudicatory economy.

At the ALJ's direction, both Norfolk Southern and the Union filed motions for summary judgment. Norfolk Southern sought summary judgment holding the 1975 Order was preempted as a matter of law. The Union filed a motion for summary judgment seeking a determination that the 1975 Order was not preempted. The ALJ issued his Recommended Decision on Preemption of the 1975 Order, deciding to: (1) grant the Norfolk Southern motion for summary judgment; (2) deny the Union's motion; and, (3) rescind the 1975 Order.

Before the PUC, the Union filed exceptions to the ALJ's recommended decision, to which Norfolk Southern filed reply exceptions.

Based on the record developed as part of the Emergency Petition, and the exceptions, the PUC denied the Union's exceptions and issued its own decision, adopting the recommended decision to the extent consistent with its own. The PUC held

evidentiary record to address the preemption of the 1975 Order as set forth in the Secretari-

the 1975 Order was preempted as a matter of law. The PUC analyzed the 1975 Order and whether it pertained to an area of railroad safety preempted by the FRSA and its regulations addressing brake implementation for unmanned equipment. The PUC then applied the savings clause to assess whether any local safety hazards in the Yard existed that were addressed by the 1975 Order and defied national uniform regulation. The PUC found the savings clause inapplicable.

The Union filed a petition for review with this Court from that order. Norfolk Southern intervened in the proceeding pursuant to Pa. R.A.P. 1531(a).

## II. Discussion

▮▮▮▮ The party who prevailed before the PUC is entitled to the benefit of every inference which can be logically drawn from the evidence viewed in a light most favorable to that party. *Wheeling & Lake Erie Ry. Co. v. Pa. Pub. Util. Comm'n,* 778 A.2d 785 (Pa.Cmwlth.2001); *Shenango Twp. Bd. of Supervisors v. Pa. Pub. Util. Comm'n,* 686 A.2d 910 (Pa.Cmwlth.1996); *see generally Balshy v. Pa. State Police,* 988 A.2d 813 (Pa.Cmwlth.2010) (*en banc*). Our review is limited to determining whether the PUC violated constitutional rights, committed an error of law, rendered a decision that is not supported by substantial evidence, or violated its rules of practice. *Regency Transp. Grp., Ltd. v. Pa. Pub. Util. Comm'n,* 44 A.3d 107 (Pa. Cmwlth.2012); *Norfolk S. Ry. Co. v. Pa. Pub. Util. Comm'n,* 875 A.2d 1243 (Pa. Cmwlth.2005). Using this deferential standard, we evaluate the PUC's grant of summary judgment in Norfolk Southern's favor.

al Letter.

### A. Summary Judgment Standard

The Union contends the PUC applied the improper standard for summary judgment as there are genuine disputes of material fact that preclude judgment in Norfolk Southern's favor. The Union asserts the PUC weighed the evidence and credibility of witnesses, particularly as to the safety of hydraulic skates as opposed to portable skates, in order to reach its legal conclusion.

The PUC interprets Section 5.102(c) (motions for summary judgment) of its regulations in conformity with Rule 1035.1 of the Pennsylvania Rules of Civil Procedure. *See S. River Power Partners, L.P. v. West Penn. Power Co.*, 696 A.2d 926 (Pa.Cmwlth.1997) (upholding PUC's grant of summary judgment). Pursuant to the PUC's Rules of Administrative Practice and Procedure, any party may move for summary judgment after the pleadings are closed. 52 Pa.Code § 5.102(a). Similar to the summary judgment standard under the Pennsylvania Rules of Civil Procedure, the presiding officer will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to a material fact, and that the moving party is entitled to judgment as a matter of law. 52 Pa.Code § 5.102(d)(1).

▮▮▮ The PUC must view the record in the light most favorable to the non-moving party, giving that party the benefit of reasonable inferences. *Mertz v. Lakatos*, 33 Pa.Cmwlth. 230, 381 A.2d 497 (1978). All doubts as to existence of a genuine issue of material fact must be resolved against the moving party. *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979). However, to preclude summary judgment, the non-moving party must establish that a genuine issue of material fact exists. *Nicastro v.*

*Cuyler*, 78 Pa.Cmwlth. 539, 467 A.2d 1218 (1983).

▮▮▮ Issues of preemption comprise pure questions of law. *In re Estate of Sauers*, 613 Pa. 186, 32 A.3d 1241 (2011). Therefore, preemption cases are appropriate for disposition on summary judgment. *See, e.g., Cellucci v. Gen. Motors Corp.*, 450 Pa.Super. 438, 676 A.2d 253 (1996) (explaining federal preemption is matter of law ripe for summary judgment). The party seeking to invoke preemption has the obligation to prove that the federal law covers the same subject matter as the state law, regulation or order it seeks to preempt. *BNSF Ry. Co. v. Swanson*, 533 F.3d 618 (8th Cir.2008). If a fact issue as to qualification for federal preemption remains, summary judgment is not proper and the issue must be determined by the fact-finder. *See Baker v. BNSF Ry. Co.*, No. 3:09–CV–0787, 2010 WL 4063203 (N.D.Tex. Oct. 13, 2010).

In this case, because both parties filed respective motions for summary judgment, both parties are the moving party and bear the burden of proving there is no genuine issue of fact material to the legal dispute. Thus, Norfolk Southern must prove it is entitled to preemption based on the undisputed facts, and the Union must disprove preemption. To disprove preemption, the Union must raise disputed issues of *material* fact that preclude judgment in Norfolk Southern's favor as a matter of law.

The limited issue presented for disposition before the PUC, and now this Court, is whether the 1975 Order is preempted by the FRSA and FRA implementing regulations. The 1975 Order pertains to run out prevention. Safety aspects of different devices are not germane to this preemption case. Thus, the PUC did not need to

assess the appropriateness of portable versus hydraulic skates.

We see no indication in the PUC opinion that it decided disputed issues of material fact to reach its conclusion. The Union declined to draw our attention to any material disputes. Accordingly, we hold the PUC properly applied the standard for summary judgment to the limited preemption issue before it.

## B. Federal Preemption

■ The principles of federal preemption are derived from the Supremacy Clause of the United States Constitution.[5] Pursuant to the Supremacy Clause, federal law reigns supreme and governs when conflicts arise between federal and state law. *Krentz v. Consol. Rail Corp.*, 589 Pa. 576, 910 A.2d 20 (2006).

■ There are three ways federal law can preempt state law:

*First,* state law may be preempted *where* the United States *Congress enacts a provision which expressly preempts the state enactment.* [*Second*], preemption may be found *where Congress has legislated in a field so comprehensively* that it has implicitly expressed an intention to occupy the given field to the exclusion of state law. *Finally,* a state enactment will be preempted *where a state law conflicts with a federal law.* Such a conflict may be found in two instances, when it is impossible to comply with both federal and state law or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Office of Disciplinary Counsel v. Marcone,* 579 Pa. 1, 17, 855 A.2d 654, 664 (2004) (emphasis added) (internal citations and quotes omitted).

The Union challenges the PUC decision for finding express preemption and comprehensive coverage by FRA regulation. Specifically, the Union criticizes the PUC for construing the FRSA as prioritizing uniformity over safety, arguing the 2007 amendments to the law deemphasize national uniformity. The Union also asserts the FRSA and FRA regulations do not comprehensively cover the field of railroad operations, and do not address the same subject matter as the 1975 Order. In particular, the Union contends the PUC's reliance upon the FRA regulation governing unattended equipment is misplaced, asserting the regulation applies to standing as opposed to moving rail cars.

The PUC and Intervenor Norfolk Southern argue the 1975 Order is squarely preempted because the FRSA expressly preempts laws in the field of railroad operation safety to ensure national uniformity. The 1975 Order covers the same subject matter addressed by a FRA regulation pertaining to unmanned equipment in a hump yard. Significantly, the FRA regulates and issues violations to Norfolk Southern regarding run out incidents pursuant to federal standards.

The PUC reasoned the FRSA preempts the 1975 Order because it contains an express preemption provision and regulates the same subject matter encompassed by FRA regulation. The Union contends the PUC did not properly analyze applicable statutory and decisional law to reach this

---

**5.** The Supremacy Clause provides in relevant part:

This Constitution and the Laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State

shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. CONST. art. VI, § 1, cl. 2.

conclusion. We review the PUC's preemption analysis for error.

### 1. Express Preemption

The "critical question in any preemption analysis is whether Congress intended that the federal enactment supersede state law." *Krentz*, 589 Pa. at 596, 910 A.2d at 32. If a federal statute has an express preemption provision, the plain words of that expression of preemption guide our preemption analysis. *Id.*

The PUC properly began its analysis by reviewing the operative statutory and regulatory framework applicable to railway safety. Like the PUC, we begin our analysis with the FRSA.

The FRSA was enacted in 1970 for the following explicit purpose: "to promote safety in *every area of railroad operations* and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (emphasis added); *see also Norfolk So. Ry. Co. v. Shanklin*, 529 U.S. 344, 120 S.Ct. 1467, 146 L.Ed.2d 374 (2000); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993). To meet this purpose, the FRSA mandates that the "Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for *every area of railroad safety* . . . ." 49 U.S.C. § 20103(a) (emphasis added); *Easterwood*.

The FRSA contains an express preemption provision that provides:

(a) **National uniformity of regulation.**

(1) Laws, regulations, and orders *related to railroad safety* and laws, regulations, and orders related to railroad security *shall be nationally uniform to the extent practicable.*

(2) *A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation* (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), *prescribes a regulation or issues an order covering the subject matter of the State requirement.*

49 U.S.C. § 20106(a) (emphasis added).

The intent of the provision is clear from its plain language preempting areas of railroad safety when federal law covers the same subject as a state law. Further, the preemption provision emphasizes national uniformity.

Despite this express language, the Union asserts Congress amended the FRSA in 2007 in order to give precedence to safety.[6] The Union asserts the PUC improperly emphasized uniformity,[7] which "is not the proper standard, and is at odds with congressional intent." Pet'r's Br. at 17.

Contrary to the Union's contention, the FRSA amendments in 2007 do not displace the goal of national uniformity or change the coverage requirement. *See Zimmerman v. Norfolk Southern Corp.*,

---

**6.** The Union emphasizes "[u]niformity and safety are mutually exclusive under the [FRSA]." Pet'r's Reply Br. at 7. The Union construes 49 U.S.C. § 103(c), "Safety as Highest Priority," as though safety generally constituted the primary goal of the FRSA. As a general provision of the FRSA, Section 103 pertains to the goal in maintaining safety in the context of the federal act and through federal regulation.

**7.** As support for its argument, the Union asserts the PUC applied the pre–2007 FRSA, without recognizing that the prior heading of Section 20106 had been changed from "National Uniformity of Regulation" to "Preemption." However, in so doing, the Union does not recognize that subsection (a) remains entitled "National Uniformity of Regulation," and is otherwise substantively unchanged.

706 F.3d 170 (3d Cir.2013). Federal regulations still preempt state law if they "cover[ ] the subject matter." 49 U.S.C. § 20106(a)(2). The continued use of this language indicates that the analysis remains the same. *Zimmerman; see also Commonwealth v. Sitkin's Junk Co.,* 412 Pa. 132, 194 A.2d 199 (1963) (presumption that similar statutory language will be interpreted the same way courts previously interpreted it).

Cases construe Section 20106(a) of the FRSA to entail national uniformity of railroad regulation. *Shanklin; Easterwood.* In asking this Court to hold to the contrary, the Union cites a single case, which does not interpret or implicate the FRSA or railroads. *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 154 L.Ed.2d 466 (2002) (applying boating law). We view the Union's position as lacking merit. *Zimmerman* removes any doubt as to the FRSA's continuing primary goal of national uniformity. Thus, the PUC committed no error in so construing the FRSA.

FRA regulations further confirm the intent of the FRSA to preempt state law covering the same subject matter. FRA regulations explicitly address preemption as follows:

**Preemptive effect.**

(a) Under 49 U.S.C. § 20106, *issuance of the regulations in this part preempts any State law, rule, regulation, order or standard covering the same subject matter,* except for a provision necessary to eliminate or reduce a local safety hazard if that provision is not incompatible with this part and does not impose an undue burden on interstate commerce.

49 C.F.R. § 232.13 (emphasis added). The FRA preemption regulation thus emphasizes that any state order, such as the 1975 Order, may be preempted by any substantive federal regulations that cover the same subject matter.

From our review of the statutory and regulatory provisions explicitly addressing preemption of state law in the railroad safety field, we see no error in the PUC's holding that these laws preempt state laws that cover the same subject.

## 2. Federal Law Covers the Same Subject Matter

We now assess whether FRA regulations cover the same subject matter addressed in the 1975 Order. In determining whether the provisions of the FRSA preempt the 1975 Order, we must consider whether federal regulations "cover" the subject matter. If the FRA has adopted a rule or regulation that covers a subject, then any state law, rule, regulation, or order, *"related to* railroad safety" that covers the same subject matter is preempted. 49 U.S.C. § 20106(a)(2).

In *Easterwood,* the United States Supreme Court noted that the phrase "related to" railroad safety is given a broad interpretation. *Easterwood,* 507 U.S. at 664, 113 S.Ct. 1732 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)). A federal statute that expressly calls for preemption of matters "relating to" the subject matter of that statute preempts "actions having a connection with or reference to" that subject matter. *Morales,* 504 U.S. at 384, 112 S.Ct. 2031. Therefore, in determining whether the 1975 Order "relates to" railroad safety, we must determine whether there is the requisite "connection with or reference to" railroad safety. *Id.; see also CSX Transp., Inc. v. City of Plymouth,* 86 F.3d 626, 629 (6th Cir.1996).

■ It is not necessary for the federal regulation to be identical to the state law or order for preemption to apply. *Easter-*

*wood.* FRA regulations cover the same subject matter when they comprise, include, or embrace the issue in an effective scope of operation, that is, "substantially subsum[ing] the subject matter of the relevant state law." *Id.* at 664, 113 S.Ct. 1732.

■■■ The regulation applied here, 49 C.F.R. § 232.103(n), governing brake systems for unmanned equipment, provides in pertinent part:

> (n) Securement of unattended equipment. A train's air brake shall not be depended upon to hold *equipment standing unattended on a grade (including* a locomotive, *a car,* or a train *whether or not locomotive is attached ).* For purposes of this section, "unattended equipment" means equipment left standing and unmanned in such a manner that the brake system of the equipment cannot be readily controlled by a qualified person. Unattended equipment shall be secured in accordance with the following requirements:
>
> (1) A sufficient number of hand brakes shall be applied to hold the equipment. Railroads shall develop and implement a process or procedure to verify that the applied hand brakes will sufficiently hold the equipment with the air brakes released.
>
> (2) Except for equipment connected to a source of compressed air (e.g., locomotive or ground air source), prior to leaving equipment unattended, the brake pipe shall be reduced to zero at a rate that is no less than a service rate reduction, and the brake pipe vented to atmosphere by leaving the angle cock in the open position on the first unit of the equipment left unattended.
>
> \*　　\*　　\*
>
> (4) A railroad shall adopt and comply with a process or procedures to verify that the applied hand brakes will suffi-

ciently hold an unattended locomotive consist. A railroad shall also adopt and comply with instructions to address throttle position, status of the reverse lever, position of the generator field switch, status of the independent brakes, position of the isolation switch, and position of the automatic brake valve on all unattended locomotives. The procedures and instruction required in this paragraph shall take into account winter weather conditions as they relate to throttle position and reverser handle.

> (5) Any hand brakes applied to hold unattended equipment shall not be released until it is known that the air brake system is properly charged.

49 C.F.R. § 232.103(n) (emphasis added) (Regulation).

The FRA issued a technical bulletin, dated March 24, 2010, from the Director of the Office of Safety Assurance and Compliance of the FRA to provide FRA inspectors with guidance in applying the Regulation (Technical Bulletin). The Technical Bulletin, entitled "Enforcement Guidance Regarding Securement of Equipment with Title 49 Code of Federal Regulations Section 232.103(n)," specifically permits railroads to utilize alternate methods, other than hand brakes, to secure unattended equipment, like rail cars.

The Technical Bulletin specifically addresses "unattended equipment in hump classification yards" like the Yard. *See* Technical Bulletin at 3; R.R. at 751a. For hump yards, a railroad may use alternate forms of securement. However "the burden of proof is on the railroad in the use of alternate securement." *Id.* Accordingly, Norfolk Southern bears the burden of providing alternate securement that is effective given the conditions in the Yard.

According to the Technical Bulletin, portable skates may be used if used within their design criteria and as intended. *Id.*

Such portable skates must be fully engaged with the rail car, preventing movement. *Id.* The Technical Bulletin specifies: *"Unengaged skates placed near the clearance points of yard tracks* (without a rail car in place) *are not considered securement." Id.* (emphasis by underline added, italics in original). Thus, the use of portable skates on the rails is not in conformity with the Regulation. Also, a single rail car that is not secured by a portable skate, and is overwhelmed by the mass of following rail cars, is not secured, and thus violates the Regulation.

The Regulation allows the railroad to use a brake system that effectively secures the unattended equipment. The Regulation addresses yard safety, securing unattended rail cars, run out prevention and braking systems to prevent run outs. These are the same subjects covered in the 1975 Order. The Yard is the only location subject to these specific requirements of using two skatemen per unattended rail car to apply portable skates to the tracks in order to prevent run outs. This is not consistent with applying brakes to the rail cars themselves as the Regulation provides.

Moreover, the Technical Bulletin specifies the railroad, here Norfolk Southern, bears the burden of providing alternate securement in a hump yard setting. To the extent the Union raised a question as to whether the Regulation pertains to unmanned rail cars that are rolling in a hump yard, the Technical Bulletin clarifies that the Regulation covers hump yards. By necessity, the Regulation pertains to rail cars rolling over the humps.

As an important practical point, the FRA inspects the Yard, applying the Regulation and Technical Bulletin to Norfolk Southern's operations. The FRA Inspector comes to the Yard two to three times weekly to perform various inspections. R.R. 530a–31a. He inspects the operations at the Yard to ensure that Norfolk Southern's employees are properly securing unattended rail cars.

Significantly, the FRA cited Norfolk Southern for non-compliance with the Technical Bulletin in failing to properly secure its unattended rail cars.[8] R.R. at 457a–60a. The FRA issued a violation report assessing a $9,500 penalty against Norfolk Southern for a run out incident.

■ The FRSA "preempts all state regulations aimed at the same safety concerns addressed by FRA regulations." *See Burlington N. R.R. v. Montana,* 880 F.2d 1104, 1106 (9th Cir.1989). There is no dispute that the 1975 Order is designed to prevent run outs. Similarly, the Technical Bulletin states it regulates the securement of rail cars by means of hydraulic skates "installed at the end of a hump yard." *See* R.R. at 753a.

Moreover, it cannot be disputed that the FRA enforces the Regulation and 49 C.F.R. § 218.101(b) as they relate to securing equipment and run outs from the Yard. The FRA monitors and inspects the tracks at the west end of the Yard. On post-violation inspections, FRA inspectors found the rail cars were properly secured

---

8. The FRA also cited Norfolk Southern with a violation of FRA regulation 49 C.F.R. § 218.101(b) pertaining to run outs and fouling adjacent tracks, and faulting Norfolk Southern for insufficient securement. We note while the parties rely upon a separate federal regulation as covering the same subject matter as the 1975 Order, this federal regulation likewise comprises subjects that are within the 1975 Order. From the violation report, it appears the FRA uses the regulations in concert with its technical bulletins in its regulation of rolling track equipment. The additional FRA regulation buttresses Norfolk Southern's federal preemption claims.

with hydraulic skates in compliance with FRA regulations.

For the foregoing reasons, we hold the FRSA and FRA regulations [9] cover the field regarding unmanned equipment and run out prevention. Therefore, the 1975 Order is preempted unless it falls within an exemption from preemption.

## C. Exemption from Preemption

Having determined that federal law covers the subject matter of the 1975 Order and that it is, therefore, preempted, we next consider whether the order survives under the savings clause in Section 20106 of the FRSA.

### 1. Savings Clause

■■■■ The FRSA and the FRA regulations each contain express preemption provisions. However, these preemption provisions provide that a state law, regulation or order is *not* preempted if it meets the following three prerequisites:

(1) [it] is necessary to eliminate or reduce an essentially local safety or security hazard;

(2) [it] is not incompatible with a law, regulation or order of the [federal] government; *and,*

(3) it does not unreasonably burden interstate commerce.

*See* 49 U.S.C. § 20106(a) (emphasis added); *see also* 49 C.F.R. § 232.13. This savings clause is to be narrowly construed. *Easterwood v. CSX Transp., Inc.*, 933 F.2d 1548, 1553 n. 3 (11th Cir.1991), *aff'd,* 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993); *Cox v. Norfolk & W. Ry. Co.*, 998 F.Supp. 679, 687 (S.D.W.Va.1998). The party opposing preemption bears the burden of proving each of these three prongs. *See Duluth, Winnipeg & Pac. Ry. Co. v.*

*City of Orr*, 529 F.3d 794 (8th Cir.2008); *Swanson.* Thus, the Union must meet all three prongs of the savings clause in order to shield the 1975 Order from federal preemption. *Id.*

The Union asserts the 1975 Order was created to address local hazards at the Yard. Therefore, the Union argues, the local hazard exemption applies, and the 1975 Order survives preemption. The Union does not address the full three-pronged test, limiting its argument to the local safety hazard prong. In its brief, the Union neglected to address incompatibility with federal law, or unreasonable burden, the other two prongs required to satisfy the savings clause.

Conversely, Norfolk Southern argues the conditions in the Yard addressed by the 1975 Order do not trigger the preemption exemption. Norfolk Southern advises the exemptions are to be used sparingly to address conditions that are incapable of being addressed in national regulations. Brake systems applied to prevent run outs of unattended cars do not present such an exceptional scenario necessitating a specific order.

The PUC defends its holding that the 1975 Order is not saved from preemption. The PUC contends the Union did not present evidence pertaining to conditions that are peculiar to the Yard, and thus necessitating a specialized order.

### 2. Local Safety Hazard

■■■ An essentially local safety hazard only applies to "local situations which are not statewide in character and not capable of being adequately encompassed within national uniform standards." *Nat'l Ass'n of Regulatory Util. Comm'rs v. Coleman,*

---

**9.** As our review is plenary as to matters of law, we hold the FRA regulation violation for which the FRA cited Norfolk Southern simi-

larly has preemptive effect on the 1975 Order, thus providing additional support for upholding preemption.

542 F.2d 11, 14–15 (3d Cir.1976); *see also Union Pac. R.R. Co. v. Ca. Pub. Utils. Comm'n,* 346 F.3d 851 (9th Cir.2003); *CSX Transp. Inc. v. Williams,* 406 F.3d 667 (D.C.Cir.2005).[10] This definition, applied uniformly for over 25 years, reflects the legislative history of the FRSA:

> The purpose of [the savings clause] is to enable the states to respond to local situations not capable of being adequately encompassed within the uniform national standards.... Since these local hazards would not be statewide in character, there is no intent to permit a state to establish statewide standards superimposed on national standards covering the same subject matter.

H.R.Rep. No. 91–1194 at 11 (1970), reprinted at 1970 U.S.C.C.A.N. 4104, 4117.

■ To ascertain whether an alleged safety hazard is essentially local in nature we "inquire into the nature of the hazard itself to determine whether it is the type of hazard that is properly dealt with at the local level." *Union Pac. R.R.,* 346 F.3d at 860; *Burlington N. & Santa Fe Ry. Co. v. Doyle,* 186 F.3d 790, 795 (7th Cir.1999). In applying the savings clause, we must also evaluate whether the state law at issue actually addresses the local hazard alleged.

■ The Union identifies the purported local safety hazard as the allegedly high incident rate for run outs and resulting collisions and employee injuries. However, high accident rates are not indicative of a local safety hazard. *See, e.g., Union Pac. R.R.* (high derailment rate); *Harris v. Norfolk S. Ry. Corp.,* No. 2:11–CV–00497, 2012 WL 6209164 (S.D.W.Va. Dec. 13, 2012) (inadequate maintenance of a spur not a local hazard); *Kill v. CSX Transp., Inc.,* 185 Ohio App.3d 291, 923 N.E.2d 1199 (2009) (high number of accidents at crossing). The frequency of accidents only serves as evidence that a hazard exists, not the "nature of the hazard itself" as essentially local. *Union Pac. R.R.,* 346 F.3d at 861; *Kill,* 923 N.E.2d at 1211.

To support its argument that the Yard poses a local safety hazard, the Union attached to its motion for summary judgment a letter from the Regional Administrator of the FRA dated January 25, 2012 (FRA Letter). R.R. at 1172a–74a. The FRA enforces its own standards regarding securing of the rail cars, and prevention of run outs in its inspections. The FRA Letter criticizes Norfolk Southern for the run outs that occurred in the Yard. *Id.* The FRA Letter also advises Norfolk Southern it must take action to comply with FRA regulations. *Id.*

Although the Union submitted this letter to prove the Yard presents an essentially local safety hazard, the FRA Letter does not characterize the situation in the Yard as "essentially local." The FRA Letter does not identify or describe any essentially local conditions that are incapable of national uniform regulation. Tellingly, the Union does not specify any within its contents.

The Union also submitted testimony of the head of the FRA's Office of Safety to support existence of a local safety hazard. The FRA representative testified regarding the FRA's recent involvement at the Yard and general testimony regarding oth-

---

**10.** We typically look to federal case law from other jurisdictions when analyzing whether preemption applies. *See Regency Transp. Grp., Ltd. v. Pa. Pub. Util. Comm'n,* 44 A.3d 107 (Pa.Cmwlth.2012) (noting PUC relied on federal case law in concluding federal law did not cover limousines and preempt state assessment); *see, e.g., Nat'l Fuel Distrib. Corp. v. Pa. Pub. Util. Comm'n,* 137 Pa.Cmwlth. 621, 587 A.2d 54 (1991) (citing federal case law to hold federal law does not preempt state power as to recovering pipeline proceeding costs).

er hump classification yards in the region. The FRA representative did not testify about any personal experience or familiarity with the Yard. Further, his testimony revealed that the FRA was addressing these concerns at other yards, and thus was capable of regulating them nationally.

In addition, the Union did not submit evidence establishing that the PUC issued the 1975 Order to address a purely local safety hazard. In fact, the order resulted from an agreement of the railroad and the Union to address ill-equipped classification tracks lacking adequate inert retarders, when inert retarders were not properly gauged. Although it applies to a single location, that does not mean the 1975 Order is "essentially local" as is required by the savings clause.

 We are unpersuaded by the evidence the Union submitted, and we hold it does not establish a "local safety hazard" exists to which the 1975 Order applies. The 1975 Order does not identify any local safety hazards it is designed to address. The hazards posed by unsecured rail cars and run outs are not conditions unique to the Yard. They do not occur due to any local or unique configuration of the Yard. These are situations that occur throughout the nation, which is one reason the FRA developed a regulation pertaining to securing unmanned equipment like rail cars. Accordingly, we uphold the PUC's conclusion that the 1975 Order is not necessary to eliminate a local safety hazard in the Yard.

As the Union failed to submit evidence showing there is any "essentially local" hazard incapable of being addressed by national standards in the Yard, the Union cannot establish this prong of the savings clause. Therefore, the Union cannot meet the three-pronged test for the preemption exemption.

## D. PUC Regulations

Lastly, the Union contends the PUC erred in failing to issue a decision regarding Norfolk Southern's alleged violations of the PUC's walkway and close-clearance regulations. In its Emergency Petition, the Union argued Norfolk Southern's placement of hydraulic skate housing obstructs walkways in violation of the PUC's walkway regulations. The Union also asserted Norfolk Southern does not have sufficient track clearances (distance between tracks) to accommodate the hydraulic skate housing. Although the Union admits in its brief that the walkway and clearance claims are not part of the 1975 Order here appealed, see Pet'r's Br. at 14, the Union believes the PUC erred in failing to address them as part of its summary judgment disposition. Lastly, the Union refutes Norfolk Southern's contentions that it waived these issues, countering that the PUC order denying its Emergency Petition did not resolve those issues with finality.

The Secretarial Letter limited the sole question before the PUC to whether the FRSA and implementing federal regulations preempted the 1975 Order. The 1975 Order pertains to run outs, not walkway standards or track clearances. There is no dispute that neither of these issues is addressed in the 1975 Order. Notably, the Union admits the alleged walkway and clearance violations are separate and independent from the preemption issue before us. See Pet'r's Br. at 28.

Other violations that the Union raised in its Emergency Petition to the PUC were not included in the specified preemption question to which this appeal is limited. Therefore, these issues are not properly before this Court. To the extent the Union raised these issues in its Emergency Petition, the PUC addressed them in its

December 2011 Order affirming the ALJ's decision denying relief.

Further, the Union failed to appeal the PUC's order denying its Emergency Petition. Such orders are appealable. *See Glade Park E. Home Owners Ass'n v. Pa. Pub. Util. Comm'n*, 156 Pa.Cmwlth. 466, 628 A.2d 468 (1993). The Union offers no reason for failing to appeal from the PUC's December 2011 order. Rather, the Union asserts the December 2011 order was not final. The Union cites no authority to support this assertion.

In addition to being beyond the confines of this appeal, the Union failed to raise these alleged PUC regulation violations in its petition for review. The Union's petition for review is limited solely to the issues of summary judgment and preemption of the 1975 Order.

■ Pa.R.A.P. 1513 requires a petition for review to contain a general statement of the objections. To properly preserve an issue, a petition for review filed pursuant to Pa.R.A.P. 1513(d), requires a general statement of objections and provides the statement of objections "will be deemed to include every subsidiary question fairly comprised therein." *Mostatab v. State Bd. of Dentistry*, 881 A.2d 1271, 1274 (Pa. Cmwlth.2005). Issues not raised in the petition for review will not be addressed. *Cohen v. State Bd. of Med.*, 676 A.2d 1277 (Pa.Cmwlth.1996).

■ Because the Union did not raise violations of PUC regulations as to walkways or clearance points in its petition for review, we hold those issues are waived. Therefore, we shall not address them.[11]

### III. Conclusion

The FRSA and its implementing regulations expressly preempt state law to the

extent the subject matter is federally regulated. The FRA Regulation applies to prevent run outs, the precise subject matter addressed in the 1975 Order. As the Regulation covers the field, the 1975 Order attempting to regulate the subject must yield. Also, because the Yard does not present a local safety hazard requiring a unique remedy that cannot be addressed by uniform national regulation, the 1975 Order does not qualify for saving from preemption. Therefore, the PUC properly granted summary judgment to Norfolk Southern based on federal preemption. Based on the foregoing, we affirm the PUC's decision and order rescinding the 1975 Order.

Judge BROBSON did not participate in the decision in this case.

### ORDER

**AND NOW,** this 20th day of May, 2013, the order of the Pennsylvania Public Utility Commission is **AFFIRMED.**

---

**11.** Because the walkway and clearance regulation violations are not included in the 1975 Order, the alleged violations are not subject to

preemption. Thus, the PUC has jurisdiction to address these issues at the administrative level.