IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Life and Health Insurance : 
Guaranty Association, : 
               Petitioner : 
               : 
        v. :   Nos. 940 - 947 C.D. 2018
               :   Argued: March 13, 2019
Pennsylvania Insurance Department, : 
             Respondent : 

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
             HONORABLE RENÉE COHN JUBELIRER, Judge
             HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MICHAEL H. WOJCIK, Judge
             HONORABLE CHRISTINE FIZZANO CANNON, Judge
             HONORABLE ELLEN CEISLER, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT           FILED: September 9, 2019

      The Pennsylvania Life and Health Insurance Guaranty Association (PLHIGA) petitions for review of an adjudication of the Insurance Commissioner sustaining the appeals of nine member health insurers (Health Insurers)[1] and reversing the assessments imposed by PLHIGA on Health Insurers' Medicare Parts C and D premium accounts. In doing so, the Commissioner concluded that the assessments, which PLHIGA imposed pursuant to the dictates of its enabling legislation (PLHIGA Act),[2] are preempted by federal law. Discerning no error by the Commissioner, we affirm.

---

[1] They are American Progressive Life and Health Insurance Company of New York, WellCare Prescription Insurance, Inc., Geisinger Indemnity Insurance Company, SilverScript Insurance Company, Pennsylvania Life Insurance Company, Accendo Insurance Company, Envision Insurance Company, Humana Insurance Company, and Humana Benefit Plan of Illinois, Inc.

[2] Article XVII of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 682, *as amended*, added by the Act of December 18, 1992, P.L. 1519, 40 P.S. §§991.1701 – 991.1718.

## I. Background

This appeal involves the interplay of federal Medicare law and Pennsylvania's life and health insurance guaranty association law. Accordingly, we begin with an overview of the law relevant to the issues raised by PLHIGA in its challenge to the Commissioner's holding on preemption.

### A. Relevant Law

### 1997 Balanced Budget Act and Regulations

As part of the Balanced Budget Act of 1997 (Balanced Budget Act), Pub. L. No. 105-33, 111 Stat. 251 (August 5, 1997), Congress created Medicare Part C, then known as Medicare+Choice or "M+C," and now commonly referred to as Medicare Advantage or "MA." Under Medicare Part C, eligible Medicare beneficiaries may elect to receive Medicare benefits through either the traditional Medicare fee-for-service program or an M+C plan. Part C provides Medicare beneficiaries with a wider range of health plan choices to complement their traditional Medicare option.

The Balanced Budget Act also included measures to control costs and ensure uniformity across Part C plans. To that end, the Balanced Budget Act states:

> *No State may impose a premium tax or similar tax* with respect to payments to Medicare+Choice organizations under section 1395w-23[3] of this title or premiums paid to such organizations under this part.

42 U.S.C. §1395w-24(g) (emphasis added). To implement this and other parts of the Act, Congress directed the United States Secretary of Health and Human

---

[3] The Balanced Budget Act requires the Department of Health and Human Services to pay Medicare Part C plans each month in advance for their coverage of individuals enrolled in their plans. 42 U.S.C. §1395w-23.

Services to "establish by regulation other standards ... for Medicare+Choice organizations and plans consistent with, and to carry out, this part." 42 U.S.C. §1395w-26(b)(1).

In 1998, the Department of Health and Human Services published a proposed preemption regulation to implement Medicare Part C. In 2000, following a public comment period, the Department issued its final regulation, which states, in pertinent part, as follows:

> (a) Basic rule. *No premium tax, fee, or other similar assessment may be imposed by any State …* or any of [its] political subdivisions or other governmental authorities with respect to any payment CMS [(Center for Medicare and Medicaid Services)] makes on behalf of MA enrollees[.]

42 C.F.R. §422.404(a) (as amended) (emphasis added).

### 2003 Medicare Modernization Act

Enacted in 2003, the Medicare Modernization Act[4] created Medicare Part D, which provides Medicare beneficiaries with a prescription drug benefit. A Conference Committee report accompanying the House version of the bill stated that the Act sought to address "some confusion in recent court cases" by reiterating that Medicare Part C "is a federal program operated under Federal rules[,]" and that "[s]tate laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Report No. 108-391, at 557 (2003) (Conf. Rep.). The report reiterated that "no state may impose a premium, or similar, tax on premiums paid to MA organizations under this bill." *Id*.

In furtherance of these objectives, Congress included a new, broader preemption provision stating as follows:

---

[4] Pub. L. No. 108-173, 117 Stat. 2066 (December 8, 2003).

3

> The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. §1395w-26(b)(3). Congress applied preemption equally to Part C and Part D plans. *See* 42 U.S.C. §1395w-112(g) ("The provisions of sections 1395w-24(g) and 1395w-26(b)(3) of this title shall apply with respect to [Medicare Part D] plans under this part in the same manner as such sections apply to … plans under [P]art C.").

In 2005, the Department of Health and Human Services issued final regulations implementing the Medicare Modernization Act. The regulation pertaining to Part C plans states:

> The standards established under this part supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to the MA plans that are offered by MA organizations.

42 C.F.R. §422.402. The regulation pertaining to Part D states, in pertinent part:

> (a) Federal preemption of State law. The standards established under this part supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) for Part D plans offered by Part D plan sponsors.
>
> (b) *State premium taxes prohibited—*
>
> > (1) Basic rule. *No premium tax, fee, or other similar assessment may be imposed by any State …* or any of [its] political subdivisions or other governmental authorities for any payment CMS makes on behalf of [a] Part D plan[.]

42 C.F.R. §423.440 (emphasis added).

4

## PLHIGA Act

PLHIGA is a nonprofit, unincorporated association created by the legislature to provide protection to Pennsylvania policyholders whose coverage was provided by an insolvent life and health insurer. A life and health insurance company is required to become a member of PLHIGA as a condition of its license or certificate of authority to do the business of insurance in the Commonwealth. Section 1704(a) of the PLHIGA Act, 40 P.S. §991.1704(a). The PLHIGA Act protects Pennsylvania policyholders and their beneficiaries, payees and assignees against failure in the performance of contractual obligations under life and health insurance policies and annuity contracts due to the impairment or insolvency of the member insurer that issued the policies or contracts. Section 1701 of the PLHIGA Act, 40 P.S. §991.1701. The entry of a court order that an insurer is insolvent and should be liquidated triggers PLHIGA's statutory duties. Subject to statutorily established limits, PLHIGA guarantees, assumes or reinsures the policy obligations of the insolvent insurer itself or causes the obligations to be guaranteed, assumed or reinsured by a solvent insurer. *See* Section 1706(a)-(c) of the PLHIGA Act, 40 P.S. §991.1706(a)-(c). PLHIGA steps in, not only to pay claims, but also to continue the insurance coverage for which the policyholders residing in Pennsylvania have bargained, within specified coverage limits. It does this by contracting with assuming insurers, third-party administrators, vendors, service providers and professionals to provide necessary policyholder services and benefits promptly after a liquidation order is entered. 40 P.S. §991.1706(n).

PLHIGA funds its consumer protection obligations through its statutory claims against the insolvent insurer's remaining assets; from premiums the policyholders must pay to PLHIGA to keep their policies in force; and through

assessments of its member insurers for the balance of the amount necessary for PLHIGA to provide coverage. *See* Sections 1706(m) and 1712(c) of the PLHIGA Act, 40 P.S. §§991.1706(m), 991.1712(c) (PLHIGA's rights to insolvent insurer's assets), Section 1706(g) of the PLHIGA Act, 40 P.S. §991.1706(g) (premiums from policyholders due to PLHIGA), and Section 1707(c)(2) of the PLHIGA Act, 40 P.S. §991.1707(c)(2) (PLHIGA's assessment of member insurers). The assessments are referred to as Class B assessments.

PLHIGA calculates a Class B assessment by determining the average proportionate share of each member insurer's relevant insurance business (in this case for the health insurance account) in the Commonwealth over the three previous calendar years. Section 1707(a), (c) and (e) of the PLHIGA Act, 40 P.S. §991.1707(a), (c), (e). The assessment is divided among the member insurers in accordance with their average proportionate share of health insurance business conducted in the Commonwealth over that period. *Id.* Health insurance business is measured by the member insurers' premium volume in Pennsylvania.

## B. Procedural History

On March 1, 2017, this Court entered orders of liquidation, with findings of insolvency, to Penn Treaty Network America Insurance Company (PTNA) and American Network Insurance Company (ANIC), both Pennsylvania life insurers specializing in long-term care insurance covering skilled nursing, nursing home, and assisted living and home health care for individuals with chronic illnesses or disabilities. The Court's entry of the liquidation orders triggered PLHIGA's powers and duties under Section 1706 of the PLHIGA Act, 40 P.S. §991.1706. On March 31, 2017, PLHIGA issued Class B assessments to its member insurers, including Health Insurers, to fund its obligations to PTNA and ANIC

6

policyholders. To calculate the assessments, PLHIGA determined the average proportionate share of each member insurer's health insurance business in Pennsylvania for calendar years 2013, 2014 and 2015. PLHIGA included each member insurer's Medicare Part C and D premiums as reported in Pennsylvania when calculating their proportionate shares.[5]

Health Insurers paid the assessments under protest, arguing that PLHIGA's inclusion of the Medicare premiums in their assessments was preempted by federal law. PLHIGA denied the appeals, and Health Insurers appealed to the Commissioner. The Commissioner sustained the appeals and ordered PLHIGA to reverse the assessments.

In doing so, the Commissioner identified the dispositive issue as whether federal law preempts the PLHIGA Act to the extent it authorizes assessments based upon premiums attributed to Medicare Part C and D plans. Unlike its counterparts in 48 other states, the PLHIGA Act does not expressly prohibit such assessments. The Commissioner held that Pennsylvania law was preempted.

The Commissioner observed that the federal regulations at 42 C.F.R. §422.404(a) and 42 C.F.R. §423.440(b)(1) specifically preempt state laws which allow an assessment against Part C and Part D plans, respectively. The Commissioner rejected PLHIGA's argument that the Department of Health and

_____

[5] The assessments of Health Insurers' Medicare Part C and D premiums in Pennsylvania totaled all of the $761,450 assessed against WellCare; part of the $951,736 assessed against American Progressive; the majority of the $3,225,505 assessed against Geisinger; all of the $3,664,885 assessed against SilverScript; a portion of Pennsylvania Life Insurance Company's $20,979 assessment; all of Accendo's $610 assessment; all of Envision's $461,880 assessment; all of Humana's $6,842,453 assessment; and all of the $1,956,557 assessment against Humana Benefit Plan of Illinois.

Human Services' preemption regulations exceeded the scope of the Balanced Budget Act. The Commissioner concluded that the regulations fit "squarely within the scope of" 42 U.S.C. §1395w-24(g), which prohibits states from imposing "a premium tax or similar tax." Commissioner Adjudication, 6/12/2018, at 30. The Commissioner explained that the federal government's comprehensive nationwide regulation of Medicare plans prevents the diminution of premium dollars by a state or other governmental authority. All of the premium dollars must be available for plan benefits and expenses consistently in every state.

In response to PLHIGA's argument that because it is not a state agency its assessments are not "taxes," the Commissioner concluded that "focusing on the nature of [PLHIGA] as an entity is not necessary to find that federal law has preempted the assessment of Medicare Part C and D premium[s]." *Id.* at 32. No matter how one characterizes PLHIGA's legal status, the assessments at issue are mandated by the PLHIGA Act, and PLHIGA is required to impose them if they are not preempted by federal law. The Commissioner observed that if Pennsylvania law is preempted to the extent it requires assessment of Medicare Part C and D premiums, then PLHIGA lacks the authority to impose the assessments, regardless of whether it is an agency or instrumentality of the Commonwealth. The Commissioner declined to hold that PLHIGA is a Commonwealth agency. She did observe, however, that PLHIGA acts "as an instrumentality of the state pursuant to the state statute and under the supervision of" the Commissioner "when performing its statutory duties and functions[.]" *Id*. at 31.

Finally, the Commissioner concluded that it was not necessary to address the 2003 Medicare Modernization Act's broad general preemption of state regulation of Medicare plans because Pennsylvania law is preempted by the federal

8

regulations specific to premium taxes and assessments. Thus, it was unnecessary to address whether the carveout in the Medicare Modernization Act for state laws related to licensing and solvency was applicable. Even so, the Commissioner found the PLHIGA Act did not fit into either of those categories.

PLHIGA has petitioned for this Court's review of the Commissioner's adjudication.

## II. Appeal

On appeal,[6] PLHIGA raises three issues. First, it argues that the Commissioner erred in determining that it is subject to the prohibition on assessments in the Balanced Budget Act and regulations because it is not a state, political subdivision or governmental authority. Concomitantly, PLHIGA challenges the Commissioner's finding that it is an instrumentality of the Commonwealth when it assesses member insurers.[7] Second, it argues that the Commissioner erred because the assessments at issue are not a "premium tax or similar tax" preempted by federal law. Relatedly, PLHIGA contends that additional prohibitions on "fees" and "assessments" do not apply to private guaranty associations such as PLHIGA. Third, it argues that because the PLHIGA Act is a state licensing law and a state law relating to plan solvency, it is not preempted by the Medicare Modernization Act. We address these issues *ad seriatim.*

---

[6] This Court's review of an agency adjudication determines "whether the adjudication violates constitutional rights, is not in accordance with agency procedure or with applicable law, or any finding of fact necessary to support the adjudication is not based upon substantial evidence." *Cope v. Insurance Commissioner*, 955 A.2d 1043, 1048 (Pa. Cmwlth. 2008) (quoting *Allen v. Insurance Department*, 903 A.2d 65, 67 n.9 (Pa. Cmwlth. 2006)). As to issues of statutory interpretation, our scope of review is plenary and the standard of review is *de novo*. *Id*.

[7] The National Organization of Life and Health Insurance Guaranty Associations (NOLHGA) has filed a brief of *amicus curiae* challenging only the Commissioner's characterization of PLHIGA as an instrumentality of the Commonwealth. NOLHGA takes no position on whether the PLHIGA Act is preempted by federal law.

9

### III. Discussion

### A. PLHIGA's Entity Status

PLHIGA argues that it is not subject to the preemption provisions of the Balanced Budget Act and the Department of Health and Human Services' regulations because those provisions apply only to states, political subdivisions and governmental authorities. *See* 42 U.S.C. §1395w-24(g); 42 C.F.R. §422.404(a); 42 C.F.R. §423.440(b)(1). PLHIGA is none of those, a point which PLHIGA views as dispositive. PLHIGA also argues that the Commissioner erred in determining that PLHIGA is acting as an instrumentality of the Commonwealth when it assesses its member insurers. Echoing the Commissioner's reasoning, Health Insurers counter that PLHIGA's entity status is irrelevant to the central issue of whether the assessment provisions of the PLHIGA Act are preempted by federal law to the extent they base assessments on Medicare Part C and D premiums. We agree.

PLHIGA's position rests on the premise that the assessments are not mandated by statute but, rather, are issued at the discretion of PLHIGA's board of directors. In support, PLHIGA cites language in Section 1707(a) of the PLHIGA Act stating that "the board of directors shall assess the member insurers … at such time and for such amounts as the board finds necessary." 40 P.S. §991.1707(a). It also cites Section 1707(d), which allows PLHIGA's board to "abate or defer, in whole or in part, the assessment of a member insurer if, in the opinion of the board, payment of the assessment would endanger the ability of the member insurer to fulfill its contractual obligations." 40 P.S. §991.1707(d). PLHIGA argues that given this discretion, it cannot be an instrumentality of the Commonwealth.

PLHIGA's arguments are based on an erroneous construction of the PLHIGA Act. The assessments are imposed by state statute, not by PLHIGA. In

enacting the PLHIGA Act, the legislature plainly stated that "members of [PLHIGA] are subject to assessment to provide funds" to carry out the purposes of the Act. 40 P.S. §991.1701. Section 1707(a) states that PLHIGA's "board of directors *shall* assess the member insurers." 40 P.S. §991.1707(a) (emphasis added). Although it is true, as PLHIGA notes, that the board shall do so "at such time and for such amounts as the board finds necessary[,]" *id.*, the phrase "finds necessary" does not grant the board discretion to assess or not assess. It must impose assessments on its members in the amount necessary to pay benefits to and continue coverages for the policyholders of insolvent insurers up to statutorily established limits. To that end, Section 1707(b)(2) further provides that "Class B assessments *shall* be made to the extent necessary to carry out the powers and duties of [PLHIGA] under section 1706 with regard to an impaired or an insolvent insurer." 40 P.S. §991.1707(b)(2) (emphasis added). The statute goes on to specify the formula that PLHIGA must use to calculate the assessment for each insurer. 40 P.S. §991.1707(c)(2).[8] Section 1706(j) provides for the Commissioner's takeover of PLHIGA if it fails to discharge its obligations with respect to insolvent insurers. 40 P.S. §991.1706(j).

In short, the PLHIGA Act mandates the imposition of assessments upon member insurers. PLHIGA's board may have some discretion in administering the assessments, but it has no discretion about the imposition of assessments or how to

---

[8] It states:

> Class B assessments against member insurers for each account and subaccount shall be in the proportion that the premiums received on business in this Commonwealth by each assessed member insurer for policies or contracts covered by each account for the three (3) most recent calendar years for which information is available preceding the year in which the insurer became impaired or insolvent, as the case may be, bears to such premiums received on business in this Commonwealth for such calendar years by all assessed member insurers.

40 P.S. §991.1707(c)(2).

11

calculate them.[9]  Health Insurers do not pay the assessments pursuant to a private arrangement between PLHIGA and its members.  The assessments are extractions of funds mandated by Pennsylvania's duly enacted law, *i.e.*, the PLHIGA Act. PLHIGA is the conduit, nothing more, nothing less.  We agree with the Commissioner that PLHIGA's entity status is irrelevant.[10]  The only issue for this Court to resolve is whether Pennsylvania's PLHIGA Act is preempted by federal law with respect to basing assessments on Medicare Part C and D premiums.

## B. Federal Preemption

In determining the preemption question, we are mindful that duly promulgated federal regulations have the force of law.  *Public Utilities Commission*

---

[9] Although PLHIGA's board can abate or defer the assessment of a member insurer, it may do so only if the assessment would endanger the ability of the insurer to fulfill its contractual obligations. Section 1707(d) of the PLHIGA Act, 40 P.S. §991.1707(d).  This narrow exception to the requirement that all member insurers be subject to an assessment cannot swallow the rule. Moreover, even if PLHIGA exercises this power, it is still obligated to ensure the assessment will generate sufficient funds to discharge its obligations to the policyholders of the impaired insurer. It will shift the burden to all other member insurers to make up any shortfall.

[10] Although the Commissioner held that PLHIGA's entity status is not outcome determinative, she observed that PLHIGA acted as an instrumentality of the Commonwealth when it assessed Health Insurers' Medicare Part C and D premiums.  We discern no error in the Commissioner's narrow observation, which was *obiter dictum*.  The Commissioner emphasized that PLHIGA is an instrumentality of the Commonwealth only with respect to the actions it took in this case.  The Commissioner's decision does not automatically apply outside the context of this case.  Both this Court and our Supreme Court have made clear that an entity's status varies "depending on the issue for which the determination is being made." *James J. Gory Mechanical Contracting, Inc. v. Philadelphia Housing Authority*, 855 A.2d 669, 677 (Pa. 2004) (quoting *Pennsylvania State University v. Derry Township School District*, 731 A.2d 1272, 1274 (Pa. 1999)). *See also Pysher v. Clinton Township Volunteer Fire Co.*, 209 A.3d 1116, 1121 (Pa. Cmwlth. 2019).  That PLHIGA acts as an instrumentality of the Commonwealth when it assesses its members as required by state law is self-evident.  As noted above, PLHIGA is a statutory facility that functions as little more than a conduit.  Whether PLHIGA is a Commonwealth entity in the other contexts suggested by PLHIGA and NOLHGA in its *amicus* brief is a question beyond the scope of this appeal that we decline to answer.

*of State of California v. United States*, 355 U.S. 534, 542 (1958). *See also Paul v. United States*, 371 U.S. 245, 255 (1963). A federal regulation preempts state law on the same subject matter. *United Transportation Union v. Pennsylvania Public Utility Commission*, 68 A.3d 1026, 1036-37 (Pa. Cmwlth. 2013). Here, the Commissioner held that the federal regulations specifically preempt state laws that allow assessments against Medicare Part C and D premiums.

We begin with the language of the applicable regulations. The first pertains to Part C premiums, and it states, in pertinent part:

> (a) Basic rule. No premium tax, fee, or other similar assessment may be imposed by any State … or any of [its] political subdivisions or other governmental authorities with respect to any payment CMS [(Center for Medicare and Medicaid Services)] makes on behalf of MA enrollees[.]

42 C.F.R. §422.404(a) (as amended). Similarly, with respect to Part D, the regulation states:

> (b) State premium taxes prohibited—
>
> > (1) Basic rule. No premium tax, fee, or other similar assessment may be imposed by any State … or any of [its] political subdivisions or other governmental authorities for any payment CMS makes on behalf of [a] Part D plan[.]

42 C.F.R. §423.440(b)(1). The language is clear and unequivocal. No premium tax, fee, *or other similar assessment* may be imposed by any state. We agree with the Commissioner that the PLHIGA Act is preempted by federal law to the extent it allows assessments to be based on Medicare Part C and D premiums.[11]

---

[11] Because we decide the assessments constitute a "fee[] or other assessment" under the federal regulations, we need not decide whether the assessments are a "premium tax or similar tax."

13

PLHIGA argues that the Commissioner erred in determining that the assessments at issue are a "fee[] or other assessment" preempted by the regulations. In support, PLHIGA cites an exchange between the Department of Health and Human Services and a commenter during the notice and comment period before the final regulation at 42 C.F.R. §422.404 was issued. The commenter asked the Department to clarify whether the Balanced Budget Act's preemption of a state's ability to assess premium taxes precludes assessments issued by private guaranty associations. The Department responded that, "[t]o the extent the commenter is referring to a guaranty fund operated by a private association, the prohibition on premium taxes would not apply." *Medicare+Choice Program*, 65 Fed. Reg. 40170, 40261 (June 29, 2000). PLHIGA contends that the Department's response answers the question before this Court today. We disagree with PLHIGA's interpretation of the Department's statement, which is taken out of context.

When the Department issued its proposed Part C regulations in 1998, it explained that guaranty association assessments were preempted by the Balanced Budget Act because the Act's "premium tax prohibition does not provide for any exception to the prohibition based on the purpose of the tax." *Establishment of the Medicare+Choice Program*, 63 Fed. Reg. 34968, 35014 (June 26, 1998). The Department noted, as an example, that some states were using a broadly applicable premium tax to fund a state guaranty fund for the benefit of enrollees of an M+C plan in the event of the plan's insolvency. While acknowledging that such taxes may provide a "social good" and "yield a direct benefit to M+C organizations and their enrollees," the Department reiterated that "there are no exceptions to the premium tax prohibition included in the [Balanced Budget Act] or in these regulations." *Id*. That said, the Department decided a Medicare Advantage plan

14

could "choose to voluntarily pay premium taxes in order to participate in such a fund." *Id*.

Two years later, when promulgating its final regulations, the Department responded to two comments on voluntary payments to a guaranty association. *Medicare+Choice Program*, 65 Fed. Reg. at 40261. The first commenter argued the "fee[] or other similar assessment" language in the regulation was too broad and not encompassed by the prohibition on a "premium tax or other similar tax" in the Balanced Budget Act. *Id*. The commenter further argued that assessments to fund state high risk pools should be permitted. The Department responded that "*any mandatory fee or assessment imposed on premium revenues clearly would fall within the reference to a premium tax or 'other similar tax.'*" *Id*. (emphasis added). The Department considered, and rejected, an exemption for an assessment to fund an insolvency insurance pool because "if the assessment was mandatory, it amounted to a tax" and was preempted. *Id*. Nevertheless, the Department reiterated its earlier comment that "an M+C organization that wished to rely on the proceeds [of] such a pool as part of its plan for insolvency protection could voluntarily contribute [to the] pool." *Id*.

It was the next commenter's objection that gave rise to the statements cited by PLHIGA. This commenter objected to the Department's suggestion that an M+C organization may participate in a guaranty fund by paying premium taxes voluntarily because some state laws do not require M+C organizations to be members of state guaranty associations.[12] The commenter argued that the scope of

---

[12] In full, the comment and response was as follows:

> Comment: A commenter objected to statements in the preamble to the interim final rule (63 [Fed. Reg.] 35014) suggesting that an M+C organization may participate in a "guaranty fund" by paying premium taxes voluntarily. The commenter pointed out that the NAIC [National Association of Insurance Commissioners] Life and

the preemption regulation should not include those funds, or at least that the Department should explicitly acknowledge that Medicare Advantage plans are not deemed member insurers under some state guaranty association laws (and not subject to mandatory guaranty association contributions), and these laws are not preempted. *Id*. The Department responded that the preemption did not extend to purely private and voluntary guaranty associations, which is the language PLHIGA relies on here. But then the Department immediately elaborated by repeating that "the mandate to contribute premium revenue" to a "State mandated insurance pool" "would be preempted." *Id*.

In sum, considered in context, the distinction drawn by the Department in the exchange of comments was not the "public versus private" one that PLHIGA tries to find. Instead, it was "mandatory versus voluntary." Mandatory assessments by state guaranty associations like PLHIGA are preempted, but voluntary contributions to associations created by Medicare Advantage plans are not preempted. The public or private nature of the operator of the association is beside the point; what matters is whether contributions are required by state law or are optional. As discussed previously in this opinion, there is no debate that the

Health Insurance Guaranty Association Model Act excludes managed care organizations from its definition of a "membered insurer." The commenter recommended that we clarify that State life and health insurance guaranty associations are excepted from the preamble discussion of "guaranty funds," or at least note that under many States' life and health guaranty association laws, M+C organizations would not be considered member insurers.

Response: To the extent the commenter is referring to a guaranty fund operated by a private association, the prohibition on premium taxes would not apply. Our reference in the preamble to voluntary contribution to a guaranty fund involved a State mandated insurance pool established and operated by the government. In this case, the mandate to contribute premium revenue would be preempted, but an M+C organization could voluntarily participate.

*Medicare+Choice Program*, 65 Fed. Reg. at 40261.

16

assessments imposed by PLHIGA on Health Insurers' Medicare Part C and D premiums are mandatory. As such, they are preempted.

The Commissioner held that the assessments are preempted under the 1997 Balanced Budget Act and the regulations discussed above. Accordingly, she decided it was not necessary to address whether the assessments are also preempted under the 2003 Medicare Modernization Act. The preemption language in that statute is even broader than its predecessor, and provides an alternative basis for affirming the Commissioner's decision. In the 2003 law, Congress expressly stated that any Medicare Part C and D regulations promulgated by the Department of Health and Human Services "shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans[.]" 42 U.S.C. §1395w-26(b)(3). *See also* 42 U.S.C. §1395w-112(g) (applying preemption provisions of Balanced Budget Act and Medicare Modernization Act to Part D plans). Thus, any state law allowing assessment of Part C and D premiums is preempted unless it falls into one of two narrow categories: a state licensing law or plan solvency law. PLHIGA argues that the PLHIGA Act is both. We disagree.

PLHIGA argues that the PLHIGA Act is a state licensing law because Section 1704(a) requires insurers to be members of PLHIGA as a condition of their authority to transact business in the Commonwealth. 40 P.S. §991.1704(a). This argument is unpersuasive. The Department of Health and Human Services' explanation of this carveout is more convincing. The Department explained that the "State licensing laws" exception "must be limited to State requirements for becoming State licensed," and does not "extend to any requirement that the State might impose on licensed health plans that -- absent Federal preemption -- must be met as a condition for keeping a State license." *Establishment of the Medicare*

*Advantage Program*, 69 Fed. Reg. 46866, 46904 (August 3, 2004). Otherwise, states could impose virtually any requirement they wished without it being preempted. Furthermore, Congress's intent to broaden the scope of federal preemption through the Medicare Modernization Act means that the exception "must be limited" and "not extended to rules that apply to State licensed health plans." *Id.*

Based on the above, we agree with the Commissioner that the PLHIGA Act is not a law "directly related" to "becoming state licensed."[13]  Rather, Section 1704(a) states that insurers must "remain members of the association as a condition of their authority to transact insurance in this Commonwealth."  40 P.S. §991.1704(a).  As explained above, requirements that "must be met as a condition for keeping a State license" are not "State licensing laws."  69 Fed. Reg. at 46904.  For these reasons, we agree with the Commissioner that the PLHIGA Act would not be subject to the carveout for licensing statutes as set forth in 42 U.S.C. §1395w-26(b)(3) and the regulations.

PLHIGA also argues that the PLHIGA Act is a "[s]tate law[] relating to plan solvency" for purposes of the exception in 42 U.S.C. §1395w-26(b)(3).  In support, PLHIGA cites Section 1701 of the Act, which requires PLHIGA to protect policyholders "against failure in the performance of contractual obligations … because of the impairment *or insolvency* of the member insurer that issued the policies or contracts."  40 P.S. §991.1701 (emphasis added).  PLHIGA further contends that it has a statutory duty to monitor the solvency of its members and,

---

[13] Pennsylvania has detailed qualifications that an insurer must satisfy to be granted a license or certificate of authority to do the business of a life and health insurer.  *See, e.g.,* Section 215 of The Insurance Company Law of 1921, Act of May 17, 1921, P.L. 682, *as amended,* 40 P.S. §405 (requirements for domestic insurer to obtain certificate of authority to transact business in Pennsylvania); Section 301 of The Insurance Company Law of 1921, 40 P.S. §421 (requisites for foreign companies to do business in Pennsylvania).

18

when appropriate, make recommendations to the Commissioner if the continued solvency of a member is in doubt. PLHIGA cites various provisions in Section 1706 of the PLHIGA Act, 40 P.S. §991.1706, as well as Section 1710(d), 40 P.S. §991.1710(d).

We disagree with PLHIGA's characterization of its enabling legislation as relating to plan solvency. PLHIGA's purpose, as defined in Section 1701 of the PLHIGA Act, is to protect policyholders and their beneficiaries, assignees and payees against failure in the performance of contractual obligations by a member insurer that is already impaired or insolvent. Similarly, Section 1706 details PLHIGA's powers over a member insurer who is impaired or insolvent, and its duties to take certain actions to assume or fund the member's obligations. These provisions have nothing to do with regulating the ongoing solvency of an insurer, a responsibility that belongs to the Insurance Department. Solvency laws are those regulating an insurer's minimum net worth, financial planning, cash flow, surplus, financial resources and state deposits. *See generally* Sections 501-A – 515-A of The Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789 (Article V-A), *as amended*, added by the Act of June 25, 1997, P.L. 349, 40 P.S. §§221.1-A – 221.15-A.[14] While it is true, as PLHIGA notes, that Section 1710(d) of the PLHIGA Act

---

[14] The National Association of Insurance Commissioners (NAIC) has devised a risk-based capital (RBC) system to measure the adequacy of an insurer's capital given the insurer's risk. The RBC system has two main components: (1) a formula that establishes a minimum capital level for an insurer and (2) a model law that grants authority to a state's insurance regulator to take action based upon the insurer's level of impairment. Pennsylvania has adopted the NAIC model law on RBC requirements, and it is codified in Article V-A, 40 P.S. §§221.1-A – 221.15-A. Pursuant to Section 502-A of Article V-A, every domestic insurer must file an RBC report with the Commissioner by March 1. 40 P.S. §221.2-A. There are four action levels under the RBC system: (1) a "company action level event," where the insurer must identify what caused its capital deficiency and take steps to correct its financial condition; (2) a "regulatory action level event," where the insurer files an action plan and the Commissioner examines and analyzes the insurer's

19

contains a "monitoring" provision,[15] this minor duty of PLHIGA's board does not make the PLHIGA Act a law regulating the ongoing solvency of a plan. 40 P.S. §991.1710(d). In short, we reject PLHIGA's argument that its enabling legislation falls under the carveout in 42 U.S.C. §1395w-26(b)(3) for state laws relating to plan solvency.

## IV. Conclusion

In summary, we agree with the Commissioner that the PLHIGA Act is preempted by federal law to the extent it authorizes PLHIGA to assess Medicare Part C and D premiums collected by its member insurers. Thus, the Commissioner did not err in sustaining Health Insurers' appeals and reversing the challenged assessments. Accordingly, the Commissioner's order is affirmed.

_____
MARY HANNAH LEAVITT, President Judge

---

business and operations and issues corrective orders; (3) an "authorized control level event," where the Commissioner may take control of the insurer; and (4) a "mandatory control level event," where the Commissioner is required to take control of the insurer. Sections 506-A – 509-A of Article V-A, 40 P.S. §§221.6-A – 221.9-A. Nothing in the PLHIGA Act gives PLHIGA this level of oversight of an insurer's solvency.

[15] Section 1710(d) states: "It shall be the duty of the board of directors, upon majority vote, to notify the commissioner of any information indicating any member insurer may be an impaired or insolvent insurer." 40 P.S. §991.1710(d).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Life and Health Insurance :
Guaranty Association,                                     :
               Petitioner          :
                               :
          v.                                   :   Nos. 940 - 947 C.D. 2018
                               :
Pennsylvania Insurance Department,      :
              Respondent          :

# **O R D E R**

And now this 9th day of September, 2019, the order of the Insurance Commissioner of the Commonwealth of Pennsylvania in the above-captioned matters dated June 12, 2018, is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge