# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

New Garden Township, : 
Petitioner :
:
v. : No. 1360 C.D. 2019
: Argued: September 17, 2020
Pennsylvania Public Utility :
Commission, :
Respondent :


BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE MICHAEL H. WOJCIK, Judge
            HONORABLE CHRISTINE FIZZANO CANNON, Judge

<u>OPINION NOT REPORTED</u>


MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER                    FILED: October 14, 2020


New Garden Township (Township) petitions for review of the Order of the Pennsylvania Public Utility Commission (Commission) that, in relevant part, approved the Application of Artesian Water Pennsylvania, Inc. (AW-PA) seeking a certificate of public convenience and approval of certain affiliated interest agreements with Artesian Resources Corporation (ARC) related to the assignment of ARC's interests in the Broad Run Well, which is located in Township, to AW-PA (Assignment Agreements). The Commission held AW-PA demonstrated that granting the requested certificate of public convenience and approving the Assignment Agreements would provide affirmative public benefits to AW-PA's customers and be in the public interest, and, therefore, AW-PA met its burdens of

proof under Sections 1103 and 2102 of the Public Utility Code (Code), 66 Pa.C.S. §§ 1103, 2102. On appeal, Township argues the Commission's findings are not supported by substantial evidence and do not support the conclusion that AW-PA met its burdens of proof. Township also asserts the Commission improperly relied upon the public benefits to customers located outside of Pennsylvania to find an affirmative public benefit. Upon review, we discern no error or abuse of discretion and, therefore, affirm the Commission's Order.

## I. Background

### A. *Factual History*

AW-PA is a Pennsylvania public utility and holds a certificate of public convenience, granted in 2002, to provide water service to 38 customers in the Broad Run Ridge Development (Development), which is located in Township and on the border with the State of Delaware. AW-PA has an affiliate, Artesian Water Company, Inc. (AW-DE), which is a public water utility located in Delaware. ARC is a holding company that wholly owns AW-PA and AW-DE. Pursuant to Section 2101(a)(1) and (3) of the Code, 66 Pa.C.S. § 2101(a)(1), (3), AW-PA is an "affiliated interest"[1] of both ARC and AW-DE. In 2002, the Commission approved an affiliated interest agreement (2002 Affiliated Interest Agreement) between AW-PA and AW-DE through which AW-DE provides AW-PA, which has no employees, with administrative and operating services and bulk water sales.

---

[1] Section 2101(a)(1) and (3) provides that an "affiliated interest" of a public utility includes: "(1) Every corporation or person owning or holding directly or indirectly 5% or more of the voting securities of such public utility" and "(3) Every corporation 5% or more of whose voting securities are owned by any person or corporation owning 5% or more of the voting securities of such public utility or by any person or corporation in any such chain of successive ownership of 5% or more of voting securities." 66 Pa.C.S. § 2101(a)(1), (3).

2

(Recommended Decision (R.D.), Finding of Fact (FOF) ¶ 17.) Under the 2002 Affiliated Interest Agreement's bulk water sales provisions, "AW-DE's public water supply system interconnects with AW-PA's distribution system at the Delaware state line." (Commission Opinion and Order (Op.) at 2.) AW-DE obtains its water from sources in the Delaware River Basin, as allocated by the Delaware River Basin Commission (DRBC),[2] by importing water from sources in the Susquehanna River Basin and Chesapeake Bay Basin, and from the Chester Water Authority (CWA), which is located in Pennsylvania. The purpose of this water distribution system is to serve AW-DE's retail Delaware customers and AW-PA's 38 Pennsylvania customers. In December 2015, AW-DE obtained DRBC-approval to withdraw up to 288,000 gallons of water from the Broad Run Well per day. (R.D. FOF ¶ 35.) DRBC gave its approval after providing a period of public comment and holding public hearings. (Supplemental Reproduced Record (S.R.R.) at 150b-52b.)

Prior to AW-PA obtaining its certificate of public convenience, ARC entered into easement agreements with Charles Wilkinson and Broad Run Valley, Inc. (BRV) (Easement Agreements). The first agreement, entered into on September 27, 2001, granted ARC "an exclusive easement to, among other things, access, operate, maintain, repair, improve, replace and connect [ARC's] water system to the [Broad Run Well]." (R.D. at 8 (internal quotations omitted).) In exchange for monthly payments to BRV, ARC and its affiliates obtained access to the Broad

---

[2] The DRBC is a federal agency, created in 1961, through a compact between the States of Delaware, New Jersey, and New York, and the Commonwealth of Pennsylvania. The DRBC has regional authority over the Delaware River Basin and is responsible for, among other things, the planning, development and regulation of the basin, water supply allocation, and conservation initiatives. (Commission Op. at 3 n.3.)

Run Well to which they could connect their water facilities. The second easement agreement, entered into on April 30, 2002, provided ARC an easement across BRV-owned property in Township to construct and operate a well field and associated water treatment and storage facilities. This agreement also allowed ARC to construct the pipeline and conduit necessary to connect the Broad Run Well facilities to ARC/AW-DE's distribution system at the boundary between Pennsylvania and Delaware. The second agreement referenced the first agreement's provision requiring monthly payments to BRV. Without the Commission's approval, AW-PA assumed ARC's duties under the Easement Agreements, but written Assignment Agreements between ARC and AW-PA were subsequently executed in 2016. (R.D. FOF ¶¶ 42-43.) AW-PA has not claimed any costs of implementing the Easement Agreements in the rates it charged to its customers. (*Id*. ¶¶ 28-29, 31.) The water supply connection between the Broad Run Well and AW-DE's water system has not been completed. (*Id.* ¶ 32.)

The instant matter involves AW-PA's May 10, 2016 Application seeking, *nunc pro tunc*, Commission approval of the Assignment Agreements, through which ARC would formally assign its interests in the two Easement Agreements to AW-PA pursuant to Section 2102(a), (b) of the Code, 66 Pa.C.S. § 2102(a), (b).[3] The Commission's Bureau of Technical Utility Services (TUS), Water/Wastewater

---

[3] Section 2102(a) provides, in pertinent part, that a "contract or arrangement providing for the purchase, sale, lease, or exchange of any property right . . ." between a public utility and any affiliated interest must have written approval from the Commission and is not "valid or effective unless and until such contract or arrangement has received" that approval. 66 Pa.C.S. § 2102(a). Section 2102(b) imposes a duty on "every public utility to file with the [C]ommission a verified copy of any such contract or arrangement," which "shall" be approved "only if it shall clearly appear and be established upon investigation that it is reasonable and consistent with the public interest." 66 Pa.C.S § 2102(b). AW-PA represented that the delay in seeking approval of the assignments was an oversight.

4

Division, which reviews such applications, requested additional information, which AW-PA provided. Following in-person discussions, TUS issued, on March 7, 2017, a letter (Secretarial Letter) denying the Application without prejudice and marking the matter closed (Staff Action). TUS determined that the Application, which involved the transfer of tangible and intangible property, required a certificate of public convenience under Section 1102, not approval under Section 2102. The Secretarial Letter indicated AW-PA could seek reconsideration and/or file a new application seeking transfer of the ARC assets under Section 1102(a)(3). AW-PA sought reconsideration, and by December 7, 2017 Order, the Commission rescinded the Staff Action, holding that the Application required consideration under both Section 1102 and Section 2101. The Commission directed AW-PA to file any additional information AW-PA considered necessary for the review of the Application under Section 1102.[4] AW-PA filed supplemental information related to review of the Application under both sections of the Code, and published the Application and supplemental information in the *Pennsylvania Bulletin*. Among others, Township and Save Our Water (SOW), a group of concerned citizens from both inside and outside Township, filed petitions to intervene and protests to the Application. The matter was assigned to an Administrative Law Judge (ALJ), who granted Township's and SOW's petitions to intervene.

---

[4] In addition, noting that AW-PA had been treating the assignments as being in effect since the early 2000s, the Commission referred "the issue of timing of [AW-PA's] filing of its affiliated interest agreements . . . to [the Commission's Bureau of Investigation and Enforcement (I&E)] for review and such further action as may be deemed necessary." (Commission Op. at 5 (alterations in original) (quotation omitted).) This portion of the litigation was bifurcated from the consideration of the Application. Ultimately, I&E and AW-PA reached a joint settlement agreement, which the Commission approved. (*Id.* at 27.)

5

B. *Proceedings Before the ALJ*

1. Parties' Evidence

AW-PA, Township, and SOW filed their pre-served written testimony before the ALJ's August 21, 2018 evidentiary hearing, at which their witnesses were subject to cross-examination. AW-PA relied on the direct, rebuttal, and rejoinder testimony of David B. Spacht, its chief financial officer, who is responsible for AW-PA's financial integrity and manages AW-PA's regulatory matters,[5] as well as exhibits related to, among other things, that testimony and the operation of AW-PA. Mr. Spacht testified that approving the Assignment Agreements would be in the public interest and create an affirmative benefit for AW-PA's customers by establishing an additional water supply source that would be available to those customers and creating a new stream of revenue for AW-PA, mitigating the potential need for future rate increases for AW-PA's customers. With regard to Broad Run Well being an additional water supply source, Mr. Spacht testified that there were times that water service from CWA was unavailable due to water quality and mechanical failures. (AW-PA Rebuttal Stmt. No. 1-R at 4, S.R.R. at 206b.) He further stated that, because the CWA contract expires on "December 31, 2021, there [wa]s no assurance that such arrangement w[ould] continue, let alone be based on terms and pricing that are acceptable and mitigate potential future rate increases for [AW-PA's] customers." (*Id.* at 5, S.R.R. at 207b.) With regard to the additional revenue source benefit, he explained that, if the Assignment Agreements were approved, AW-PA would: finalize its infrastructure designs allowing it to connect a raw water line from the Broad Run

---

[5] Mr. Spacht is also the chief financial officer of ARC and AW-DE and performs the same duties for those entities as he does for AW-PA.

Well to AW-DE's facilities at the Pennsylvania-Delaware border and seek approval of a new affiliated interest agreement with AW-DE (Well and Water Services Agreement), through which AW-DE would compensate AW-PA for its use of the Pennsylvania infrastructure to obtain access to and use of the raw water drawn from the Broad Run Well as allocated by the DRBC. In addition, Mr. Spacht testified, the agreement would require AW-DE to reimburse AW-PA for all costs AW-PA had incurred and would incur related to the Broad Run Well and the associated infrastructure needed to deliver water to the Delaware state line. The Well and Water Services Agreement would provide AW-PA a new stream of revenue without it having to pay the costs associated with developing the Broad Run Well, which would be borne by AW-DE. Last, the Well and Water Services Agreement would allow AW-PA to retain the right to use the Broad Run Well itself should new land development occur that would add new customers to AW-PA.

Township sought to establish, through the testimony of G. Matthew Brown, P.E., that there was no benefit to AW-PA's customers by placing the Broad Run Well into service because there was no direct connection between that well and the Development. As the raw water from the Broad Run Well still had to travel through AW-DE's facilities before returning to Pennsylvania, Township maintained that AW-PA's customers would receive their water at the same volume and pressure as their current levels, and there would be no improvement to the reliability of those water services. Further, Township contended AW-PA did not establish that its customers have an inadequate water supply or pressure through the current sources, including CWA. Notwithstanding that it was AW-DE that had the contract with CWA, Township argued that the decision to renew, or not, the

7

agreement with CWA was in AW-PA's control and AW-PA could not use the non-renewal as a reason for approving the Application because it would be a hardship of its own making. Last, Township criticized AW-PA for not guaranteeing that its customers' rates would not increase.

SOW, relying on the testimony of David E. Yake, a SOW Board Member, questioned the amount of water to be withdrawn from the Broad Run Well in comparison to the actual needs of AW-PA's 38 customers. It argued that the amount approved by the DRBC, 288,000 gallons per day, was 33 times the amount needed for AW-PA's customers. Arguing that AW-PA's current system provided adequate water service, SOW asserted allowing the withdrawal of the approved volume of water would not benefit Pennsylvania customers.

AW-PA submitted rebuttal evidence that Township's arguments missed the point that adding the Broad Run Well as a water source created a benefit to AW-PA's customers because it was raw water that was not owned or priced by a third party, such as CWA. It further asserted that reliability for its customers would be improved due to the close proximity between the Broad Run Well and the Development. As for Township's contentions regarding the renewal of agreement with CWA, AW-PA contended that the Commission is not to micromanage a utility and decisions regarding a contract with a water supply source should be left to AW-PA's management. In regard to its failure to guarantee no rate increase, AW-PA asserted there was no need to make such guarantee because the absence of a future harm can be relied upon so long as it is not the only benefit asserted. Finally, AW-PA argued SOW's objection based on the need for the amount of water allocated fell within the DRBC's jurisdiction and that it did not have to

8

prove an absolute need for the additional water, just that an affirmative benefit would result.

## 2. The ALJ's Recommended Decision

The ALJ found that AW-PA met its burdens of proof under Sections 1103(a) and 2102(b) of the Code, which, respectively, required AW-PA to prove by a preponderance of the evidence that: (1) the certificate of public convenience "is necessary or proper for the service, accommodation, convenience, or safety of the public" and provides an affirmative public benefit; and (2) approving the Assignment Agreements between ARC and AW-PA is reasonable and consistent with the public interest. (R.D. at 20-21, 23 (quoting 66 Pa.C.S. § 1103(a)).) Noting that AW-PA's asserted affirmative public benefits were based on the provision of an alternative water supply and increased revenues, benefits that were not refuted, the ALJ concluded that Township's arguments that there would not be greater adequacy of water service or quality were not persuasive because those were not the benefits AW-PA asserted. (R.D. at 26.) As for improved reliability, the ALJ held that the closer proximity between the Broad Run Well and AW-PA's customers, as compared to CWA's proximity to those customers, did not prove better reliability because the raw water still had to go through the AW-DE system before reaching AW-PA's customers. However, the ALJ also concluded "the addition of an alternative source of supply to the existing source of water to Pennsylvania customers inherently yields a greater dependability for service to Pennsylvania customers . . . [i]n that, if the CWA supplied water is problematic, there exists an alternative to obtain supplied water." (*Id.* at 29.)

As for the contract with CWA and arguments that AW-PA's existing water sources were adequate to meet AW-PA's needs, the ALJ agreed with AW-PA that

9

the current adequacy of its water supplies should not prevent AW-PA from seeking more efficient, cost-effective means of meeting its legal obligation to provide safe, adequate, and reasonable service to its customers, and that holding otherwise would be micromanaging. Further, the ALJ held AW-PA did not have to prove an absolute need to meet its burden of proof, *Hess v. Pennsylvania Public Utility Commission*, 107 A.3d 246, 262 (Pa. Cmwlth. 2014), and water allocation decisions were not within the Commission's jurisdiction, as it does not have jurisdiction over state or federal environmental laws. The ALJ observed that, pursuant to the Well and Water Services Agreement, AW-PA would obtain a new revenue stream that could mitigate the need for future rate increases for AW-PA's retail customers, and the Assignment Agreements were "critical water supply arrangements to ensure safe, adequate and reasonable service to" AW-PA's 38 customers. (R.D. at 28.) The ALJ found that AW-PA's lack of guarantee regarding increased rates was insufficient to rebut AW-PA's evidence of affirmative benefits because the mitigation of future rate increases was not the only benefit AW-PA asserted. The ALJ explained that, pursuant to the Well and Water Services Agreement, AW-DE would bear the costs of the Easement Agreements and the costs necessary to develop the Broad Run Well, and AW-PA's customers would not have to bear those costs, which was "a public benefit to AW[-]PA and its customers." (*Id.* at 30.) The ALJ also noted that in determining whether the public interest existed, "all affected parties, and not merely one particular group or geographic subdivision," should be considered. (*Id.* at 53 (quoting *Middletown Twp. v. Pa. Pub. Util. Comm'n*, 482 A.2d 674, 682 (Pa. Cmwlth. 1984)).)

For these reasons, the ALJ found that approving the Assignment Agreements and assigning the Easement Agreements to AW-PA were in the public benefit and

met the affirmative public benefit test because they would: provide an additional water supply and increase reliability to AW-PA's customers; be an additional revenue source to AW-PA; allow AW-PA to avoid passing on the costs of acquiring the right to access and use the Broad Run Well to AW-PA's customers; allow AW-PA to earn income and return of anticipated costs on operating the Broad Run Well, which stabilized AW-PA's rates to the benefit of its customers; and mitigate any potential future rate increases to AW-PA's customers due to the revenue stream created by the Well and Water Services Agreement with AW-DE. (R.D. at 24-25.) Thus, the ALJ recommended the grant of a certificate of public convenience and approval of the Assignment Agreements.

### C. Township's Exception and the Commission's Opinion

#### 1. Township's Exception and AW-PA's Reply

Township filed an exception[6] asserting the ALJ erred in determining that AW-PA established that affirmative public benefits will result from these assignments. Township argued, among other things, the ALJ's finding that the Broad Run Well would be an additional source of water is not supported by the record because that well is part of AW-DE's water supply, which is combined with other sources and then interconnected with AW-PA's system at the Pennsylvania-Delaware border. Even if it was an additional water source, Township asserted, it did not qualify as a substantial benefit to AW-PA's customers because the existing water supply, including the contract with CWA, satisfied AW-PA's existing needs. Township further asserted the ALJ erroneously relied on *Middletown Township* as

---

[6] Township filed multiple exceptions, but this is the only one relevant to its current arguments on appeal. AW-PA and I&E also filed exceptions on issues that are unrelated to the issue on appeal.

11

support for the acceptance of benefits to Delaware customers, not AW-PA's Pennsylvania customers, as a basis to find affirmative public benefits existed because *Middletown Township* involved only Pennsylvania customers.

AW-PA responded that it met its burdens of proof under Sections 1103 and 1202 of the Code and the ALJ's findings are supported by substantial evidence. According to AW-PA, Township challenged only one of the affirmative benefits found by the ALJ, leaving the rest unchallenged and supporting the ALJ's recommendation. As for the affirmative benefit challenged by Township, AW-PA asserted the ALJ properly concluded the Broad Run Well would be an additional alternate source of water available to AW-PA's customers because this water will be added to the AW-DE system, which supplies AW-PA with bulk water, and this alternate source is beneficial should CWA's water supply be problematic or the contract with CWA expires. As for Township's claim that the existing water supplies satisfy AW-PA's needs, AW-PA maintained it is not the Commission's role to micromanage a public utility's management decisions and its decision to develop the Broad Run Well in an effort to reduce costs while providing the most service safely and reliably is a management decision. Finally, AW-PA responded that Township's claim that the ALJ improperly relied on benefits to customers in Delaware takes the ALJ's decision out of context and does not alter the fact that the ALJ specifically found that the Assignment Agreements would provide substantial affirmative benefits to AW-PA's customers.

2. The Commission's Opinion

Upon reviewing the record, the Recommended Decision, Township's exception, and AW-PA's response, the Commission denied the exception and adopted the ALJ's Recommended Decision on this issue. Initially, the

12

Commission observed that AW-PA is a smaller water utility, serving only 38 customers, and AW-PA's participation in the integrated water utility system with AW-DE, through the 2002 Affiliated Interest Agreement, provided AW-PA "substantial benefits and economies of scale" because it was AW-DE that, among other things, obtained the necessary DRBC approvals, owned and operated the water treatment facilities, and sourced water that served both AW-DE's customers **and** AW-PA's customers in Pennsylvania. (Commission Op. at 79.) The Commission found "AW-PA . . . met its burden of demonstrating an affirmative public benefit related to the transfer of the subject property interests . . . from ARC to AW-PA under the Assignment Agreements, and also has demonstrated that approval of the Assignment Agreements is reasonable and in the public interest." (*Id.* at 78.) The Commission held AW-PA was not obligated to demonstrate that the transfer was absolutely necessary, but that there was an affirmative public benefit to support granting the Application.

The Commission addressed the arguments that the Broad Run Well was not an alternative source of water for AW-PA's customers and that the existing water supply was sufficient for AW-PA's needs. According to the Commission, the ALJ's finding that the Broad Run Well would be an alternative source of water for AW-PA was supported by AW-PA's evidence that AW-DE had obtained water allocation from the DRBC for the Broad Run Well and intended to use that allocation for its customers in Delaware **and** to supply AW-PA's customers with water. (*Id.* at 79.) The Commission agreed with the ALJ that adding an alternative source of water to AW-PA's Pennsylvania customers would "inherently yield greater reliability of service." (*Id.* at 80.) The Commission explained that whether AW-DE's contract with CWA was sufficient to meet AW-PA's needs "misse[d]

13

the point" because "prudent utility management can and should strive to provide the most cost-efficient way to deliver utility service to meet its legal obligations . . . to provide customers safe, adequate and reasonable service, at reasonable rates." (*Id.*) Concluding that "AW-PA's efforts to develop the Broad Run Well [were] clearly in furtherance of that goal," the Commission would not "second guess or micromanage" AW-PA's judgment on how it manages its business or on whether it needed to take proactive action to meet its legal obligations. (*Id.*)

The Commission indicated that the proceedings on the Application did not "directly affect or undermine the regional reach of DRBC's water allocation decisions." (*Id.*) The Commission explained it could consider the impacts on "'all affected parties, and not merely one particular group or geographic subdivision,'" (*id.* at 11-12 (quoting *Middletown Township*, 482 A.2d at 682 (emphasis omitted))), and it was "reasonable to recognize, and nothing under applicable law prevent[ed it] from recognizing,[] the regional benefits of the Broad Run Well and the Assignment Agreements to customers in both Pennsylvania and Delaware," particularly given AW-DE's and AW-PA's integrated water public utility system, (*id.* at 80 (footnote omitted)). Approving the Application, the Commission held, would give AW-PA operational control over the Broad Run Well's raw water source, which would serve AW-PA's customers and AW-DE's customers. The Commission reiterated that adding the "alternative water supply source inures to adequate and reliable service to both Pennsylvania and Delaware customers." (*Id.* at 81.) The Commission concluded that because "**Pennsylvania customers specifically**" would benefit, the transfer of the property interests from ARC to AW-PA demonstrated an affirmative public benefit and was in the public interest. (*Id.* (emphasis in original).)

14

The Commission found additional affirmative public benefits would result from approval of the transfer as a result of the anticipated Well and Water Services Agreement between AW-PA and AW-DE. According to the Commission, an affirmative public benefit existed because AW-DE would pay AW-PA for the development and operation of the Broad Run Well, as well as for the raw water supplied therefrom, AW-PA would receive a return on the property and a new revenue stream, which Mr. Spacht testified, could "serve to stabilize rates and/or mitigate the need for, or the amount of, future rate increases for AW-PA retail customers." (*Id.* (citing AW-PA Stmt. No. 1 at 18; Hearing (Hr'g) Transcript (Tr.) at 48-51, Reproduced Record (R.R.) at 420a-23a).) And, although Township challenged AW-PA's not "guaranteeing" the beneficial rate impact, the Commission explained that it "is not required to secure legally binding commitments or to quantify benefits where this may be impractical." (Hr'g Tr. at 82 (quoting *Popowsky v. Pa. Pub. Util. Comm'n*, 937 A.2d 1040, 1057 (Pa. 2007) (*Popowsky III*).) Thus, the Commission found "the potential mitigating effect on future customer rate increases resulting from the new revenue stream associated with [the] Well and Water Services Agreement and AW-PA's operation of the Broad Run Well is in the public interest and demonstrates an affirmative public benefit to AW-PA's customers." (*Id.*)

For these reasons, the Commission approved the Assignment Agreements pursuant to Section 2102(b) and granted the certificate of public convenience pursuant to Section 1103(a) allowing for "the transfer of the subject property

15

interests from the affiliated parent, ARC, to AW-PA, under the Assignment Agreements." (*Id.* at 82.)  Township now petitions this Court for review.[7]

## II.    Township's Appeal

*A. Parties' Arguments*

1. <u>Township</u>

On appeal, Township argues the Commission erred and abused its discretion in granting the certificate of public convenience and approving the Assignment Agreements because the Commission's findings that AW-PA established that an affirmative public benefit to Pennsylvania customers would occur is not supported by substantial evidence.    Township argues this matter involves statutory interpretation, which requires the Court to ascertain and effectuate the General Assembly's intent by giving effect to all of the Code's provisions, which the Commission's decision did not do.    Township asserts that, in order for the Commission to grant the certificate of public convenience, AW-PA had to present evidence that satisfied the requirements of Section 1103(a), and that AW-PA presented "no evidence, let alone substantial evidence," that would support the Commission's finding that AW-PA met its burden of proof.  (Township's Brief (Br.) at 12.)  It is not sufficient, Township argues, for a utility to show that the approval would not cause detriment to the public; the utility must show that the approval sought would create an actual, affirmative public benefit to AW-PA's customers.  (*Id.* at 17 (citing *City of York v. Pa. Pub. Util. Comm'n*, 295 A.2d 825, 828 (Pa. 1972)).)

---

[7] "Appellate review of a [Commission] order is limited to determining whether a constitutional violation, an error of law, or a violation of [Commission] procedure has occurred and whether necessary findings of fact are supported by substantial evidence."  *Popowsky v. Pa. Pub. Util. Comm'n*, 910 A.2d 38, 48 (Pa. 2006) (*Popowsky II*).

16

Township contends the Commission overlooked substantial evidence that developing the Broad Run Well would not provide an affirmative public benefit to those customers. Township observes the Commission "acknowledged" or "noted" the ALJ's rejection of AW-PA's claim that adding the Broad Run Well, notwithstanding its closer proximity to the Development, would not necessarily result in "reliability or financial liability," citing the fact that the water first goes through AW-DE's system rather than being "directly interconnected to the AW-PA's customers." (*Id.* at 18-19.) These statements by the Commission, Township argues, demonstrate the lack of affirmative public benefit to AW-PA's customers. It further challenges the Commission's inference that the existence of an additional water supply created the required affirmative public benefit based on the Commission's conclusion that adding an "alternative source of supply . . . 'inherently yields greater dependability for service to Pennsylvania customers.'" (*Id.* at 19 (quoting Commission Op. at 80).) An inference, Township argues, is not substantial evidence that would support the Commission's findings.

It argues that the Broad Run Well is not an independent source of water for those customers, but will be interconnected with AW-DE's approximately 50 other water sources, aggregated, and then redistributed to AW-PA's customers through the interconnection. This means, Township argues, that the Broad Run Well is simply another source of water within AW-DE's existing DRBC-allocated water supply that **may** be available to AW-PA's customers and, as such, cannot be said to be a substantial benefit to Pennsylvania customers. Further, Township asserts, the evidence showed that the existing arrangement between AW-DE and AW-PA meets the "needs of the 38 customers, and . . . nothing in the record suggests that development of the Broad Run Well and its interconnection with the AW-DE

17

water system . . . [will] alter the *status quo* as to the actual service provided by AW-DE to AW-PA for those 38 customers." (*Id.* at 20-21.)

Township also argues the Commission erred because it considered the benefit to Delaware residents, not Pennsylvania residents, in approving the Assignment Agreements. Township asserts the Commission's reliance on *Middletown Township* to support its consideration and acceptance of the benefit to AW-DE's Delaware customers, as "affected parties," is misplaced because that case involved the interests of Pennsylvania customers in neighboring communities, not out-of-state customers as here. (*Id.* at 22.) In considering those out-of-state interests, Township contends, the Commission acted at odds with its own purpose and the public interest the Commission is intended to protect by "undermin[ing] public policy and confidence in our system." (*Id.* at 25.) It posits "the Commission is simply being used as a means to an end," and that end does not benefit Pennsylvania customers, which is the only interest that the Commission should consider and promote. (*Id.* at 26.)

## 2. The Commission

The Commission responds its decision was based on substantial evidence that adding the Broad Run Well would provide an affirmative public benefit to AW-PA's Pennsylvania customers. According to the Commission, through the 2002 Affiliated Interest Agreement between AW-DE and AW-PA, AW-DE provides AW-PA with, among other services, bulk, potable water, which AW-PA then provides to its retail customers in Pennsylvania. Therefore, the Commission maintains, the addition of the Broad Run Well's water to AW-DE's water supply, which is interconnected with AW-PA's customers, provides an additional, alternate source of water for AW-PA. The availability of the additional and alternate source

18

of water provides an inherent public benefit in greater dependability of service, the Commission argues, because it will be available if problems occur with CWA's supply of water, which has happened according to Mr. Spacht. As for the current contract with CWA, and the current water supply meeting AW-PA's needs, the Commission asserts that with this contract expiring in December 2021, "there is no assurance that a new arrangement will be entered, and terms and pricing may not be acceptable to mitigate future increases for AW-PA's customers." (Commission's Br. at 17-18.) Adding the Broad Run Well to AW-DE's water supply, and therefore AW-PA's water supply, the Commission maintains, "safeguard[s] against interruption of service which secures adequate service to Pennsylvania customers." (*Id.* at 19.) Further, the Commission argues, nothing should preclude AW-PA from striving to be proactive and seek out ways to provide cost-efficient ways to meet its legal obligations, which is within AW-PA's discretion in managing its business and not subject to micromanagement by the Commission. *Pa. Pub. Util. Comm'n v. Phila. Elec. Co.*, 460 A.2d 734, 737-38 (Pa. 1983).

The Commission further responds that it found other affirmative public benefits result from the approval of the Affiliated Agreements and grant of the certificate of public convenience, such as those derived from the Well and Water Services Agreement between AW-PA and AW-DE, which Township does not refute. The Commission argues that, through that agreement, AW-PA and its customers benefit because AW-PA acquires ARC's property interests in the Easement Agreements and AW-PA develops and operates the Broad Run Well and connects the well to AW-DE's water facilities, without AW-PA or its customers having to pay the associated costs, as those costs will be borne by AW-DE. The

19

Well and Water Services Agreement also benefits AW-PA and its customers, the Commission asserts, because it creates a new revenue stream that can be used, per Mr. Spacht, to stabilize AW-PA's customers' rates and/or mitigate the need for, or amount of, any future rate increases. Such evidence supports the Commission's finding that granting AW-PA's Application results in affirmative public benefits for AW-PA's Pennsylvania customers.

The Commission refutes Township's argument that it relied only upon the benefits to Delaware customers to find that AW-PA met its burden of proving affirmative public benefits, citing its specific findings as to the affirmative public benefits to AW-PA's Pennsylvania customers, while also acknowledging the benefits to AW-DE's Delaware customers. This acknowledgment, the Commission asserts, does not constitute an error of law where it performed a Pennsylvania-specific inquiry, as required by *Popowsky III*, 937 A.2d at 1061, because the Supreme Court in *Popowsky III* held that considering out-of-state benefits does not mean that the Commission abdicated its responsibility under the Code.

### 3. AW-PA

AW-PA, which has intervened, argues Township asks the Court to re-weigh the evidence and substitute the Court's judgment for that of the Commission. However, AW-PA contends, the weighing of evidence is within the Commission's discretion, not this Court's. AW-PA maintains there is "substantial and overwhelming evidence," through Mr. Spacht's testimony, that the Assignment Agreements "are critical water supply arrangements" obtained "to ensure the continued provision of safe, adequate and reasonable service to AW[-]PA's Pennsylvania customers," particularly with the upcoming expiration of the contract

20

with CWA. (AW-PA's Br. at 26-28.) Further, Mr. Spacht testified regarding the benefits of the Well and Water Services Agreement to AW-PA and its Pennsylvania customers. Such evidence, AW-PA asserts, supports the Commission's conclusions that AW-PA met its burdens under Sections 1103(a) and 2102(b) of the Code. Contrary to Township's assertions, AW-PA argues, AW-PA did not have to prove absolute necessity or quantify the benefits of the transaction, but could meet its burden by showing that future need for and future benefits of the project would be in the public interest. *Popowsky III*, 937 A.2d at 1055-57; *Hess*, 107 A.3d at 262. In addition, AW-PA asserts it never claimed that its existing arrangements were not reliable, but it is not required to do so in order to exercise its managerial discretion to pursue new arrangements that would meet its bulk water supply needs in a manner superior to the contract with CWA and create new revenue for AW-PA. As for Township's argument that the Commission erred by inferring a benefit to AW-PA's customers, AW-PA argues that this inference is a reasonable conclusion based on the evidence adduced regarding future water supply conditions in the AW-DE system, which serves AW-PA's customers. Finally, AW-PA notes that although Township argues the Commission overlooked evidence that there would be no benefit from developing the Broad Run Well, Township does not bring any such evidence to the Court's attention.

In response to Township's arguments against the Commission's consideration of the benefits to out-of-state customers, AW-PA argues this consideration does not warrant the reversal of the Commission's decision. AW-PA asserts that reviewing the benefits to all the affected parties here, in view of the interconnected water system serving both AW-PA and AW-DE, was reasonable and does not undermine the Commission's finding of specific benefits for AW-

21

PA's Pennsylvania customers, which supports the grant of the certificate of public convenience.

4. Township's Reply

Township responds that neither the Commission nor AW-PA explained what evidence presented to the Commission created an actual, tangible benefit to the public rather than mere possible affirmative public benefits. Township asserts there was no proof that adding an alternate water source would result in a public benefit in Pennsylvania, particularly where AW-PA's current needs are met by the existing arrangement, and the absence of a detriment, a potential rate increase, is not affirmative proof of a public benefit. Any benefit AW-PA or AW-DE experiences from the addition of an alternate water source is not a benefit to AW-PA's 38 Pennsylvania customers, Township argues. Further, according to Township, the Commission's conclusion that a benefit can be "presumed" results in the creation of an "illusory" approval process whereby a water utility could obtain approval to acquire new water sources without ever having to prove an actual public benefit by substantial evidence. (Township's Reply Br. at 7.) Township asserts the Commission's reliance on regionalization of water systems and the DRBC's approvals is misplaced because the relevant regionalization should be within the Commonwealth, not with an out-of-state utility, and the DRBC's findings cannot replace the Commission's obligations under the Code. As for the arguments that this decision was a managerial decision that could not be micromanaged by the Commission, Township responds that ensuring that AW-PA meets its burden of proving an affirmative public benefit is not micromanaging but is the Commission's legal responsibility under the Code. Finally, Township contends neither the Commission nor AW-PA defend, they only "downplay," the

Commission's reliance on the benefit to Delaware customers to conclude there was an affirmative public benefit, notwithstanding that a "Pennsylvania-specific analysis" is required. (*Id.* at 13-14 (emphasis omitted).) Township maintains it was improper for the Commission to consider the benefit to Delaware customers "at all," (*id.* at 14-15 (emphasis omitted)), and, therefore, the Commission's decision was erroneous.

## *B. Discussion*

Township raises two arguments before the Court: (1) a substantial evidence challenge to the Commission's findings that an "affirmative public benefit" will result from its approval of the Assignment Agreements and grant of the certificate of public convenience; and (2) a legal challenge to the Commission's consideration of and reliance on public benefits to customers outside of Pennsylvania and the determinations of the DRBC. Before addressing these issues, we set forth the relevant legal principles that guide our appellate review of the Commission's decision.

### 1. Relevant Legal Principles

This matter arises out the Commission's conclusions that AW-PA met its burdens of proof under Sections 1103(a) and 2102(b) of the Code. Section 1103(a) addresses the grant of a certificate of public convenience and provides in relevant part: "A certificate of public convenience shall be granted . . . **only if** the [C]ommission shall find or determine that **the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public**." 66 Pa.C.S. § 1103(a) (emphasis added). Section 1102(a)(3) of the Code requires that a certificate of public convenience be obtained whenever a

public utility or affiliated interest of a utility "acquire[s] from[] or transfers to . . . any person or corporation . . . , by any method or device whatsoever . . . the possession or use of[] any tangible or intangible property used or useful in the public service." 66 Pa.C.S. § 1102(a)(3). To grant a certificate of public convenience for this purpose, the Commission must find that the proposed transaction will "affirmatively promote the service, accommodation, convenience, or safety of the public in some substantial way." *City of York*, 295 A.2d at 828 (quotation marks omitted). The standard used to determine whether a transaction is in the public interest is the "affirmative public benefits" test. *Popowsky III*, 937 A.2d at 1052-53, 1055. This standard does not require, as our Supreme Court has explained, the Commission "to secure legally binding commitments or to quantify benefits where this may be impractical, burdensome, or impossible"; rather, the Commission will "make factually-based determinations" applying the preponderance of the evidence standard. *Id.* at 1057. Under the preponderance of the evidence standard, the Commission is "not required to ensure beyond all doubt that the noted public benefits would accrue." *Id.* at 1055 n.18. Instead, this evidentiary standard "means only that one party has presented evidence that is more convincing, by even the smallest amount, than the evidence presented by the other party." *Energy Conservation Council of Pa. v. Pub. Util. Comm'n*, 995 A.2d 465, 478 (Pa. Cmwlth. 2010). Nor does the affirmative public benefit standard require that every utility customer benefit from a proposed transaction, *Popowsky III*, 937 A.2d at 1061, or the utility's proposed action be absolutely necessary, *Hess*, 107 A.3d at 262. "We also bear in mind that, on account of the Commission's expertise in the utility arena, reviewing courts accord considerable deference to the agency concerning the certification process." *Popowsky III*, 937

24

A.2d at 1054. Thus, the decision to issue a certificate of public convenience "falls squarely within the [Commission's] area of expertise and is best left to the [C]ommission's discretion." *Elite Indus., Inc. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 432 (Pa. 2003).

Section 2102(b) governs the approval of agreements between affiliated interests and states in pertinent part:

> It shall be the duty of every public utility to file with the [C]ommission a verified copy of any such contract or arrangement, or a verified summary as described in subsection (a) of any such unwritten contract or arrangement. . . . . **The [C]ommission shall approve such contract** or arrangement made or entered into after the effective date of this section **only if it shall clearly appear and be established upon investigation that it is reasonable and consistent with the public interest**.

66 Pa.C.S. § 2102(b) (emphasis added). No affiliated interest agreement is effective until the Commission approves the agreement. 66 Pa.C.S. § 2102(a).

In reviewing the Commission's decisions, it is well settled that the Commission "is the ultimate factfinder[] and makes all decisions as to the weight and credibility of evidence." *Borough of Duncannon v. Pa. Pub. Util. Comm'n*, 713 A.2d 737, 739 (Pa. Cmwlth. 1998). For a Commission finding to be supported by substantial evidence, which is "the amount of relevant evidence which a reasonable person would accept as adequate to support a determination," *Popowsky III*, 937 A.2d at 1054, there must be "more than a mere trace of evidence or suspicion of the existence of a fact sought to be established," *HIKO Energy, LLC v. Pa. Pub. Util. Comm'n*, 163 A.3d 1079, 1094 (Pa. Cmwlth. 2017) (quoting *Lyft, Inc. v. Pa. Pub. Util. Comm'n*, 145 A.3d 1235, 1240 (Pa. Cmwlth. 2016)), *aff'd*, 209 A.3d 246 (Pa. 2019). Additionally, the record evidence, as well as the

inferences that can be logically drawn from that evidence, must be "viewed in a light most favorable to" "[t]he party who [sic] prevailed before the" Commission. *United Transp. Union v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1032 (Pa. Cmwlth. 2013). It is irrelevant if "the record may contain evidence that supports a different result than that reached by the [Commission] . . . so long as the record contains substantial evidence supporting the [Commission's] decision." *Lyft, Inc.*, 145 A.3d at 1240. This Court should not "'substitute its judgment for that of the [Commission] when substantial evidence supports the [Commission]'s decision on a matter within the [C]ommission's expertise,' nor should it indulge in the process of weighing evidence and resolving conflicting testimony." *Energy Conservation Council of Pa.*, 995 A.2d at 478 (citing *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1201 (Pa. 1997) (*Popowsky I*)). However, the legal conclusions derived from the Commission's factual findings are questions of law that are subject to this Court's de novo review. *Hess*, 107 A.3d at 258 n.7.

With these principles in mind, we turn to Township's first issue.

2. <u>Whether the Commission's Findings of an "Affirmative Public Benefit" to AW-PA's Customers are Supported by Substantial Evidence and Sufficient to Grant the Certificate of Public Convenience and Approve the Assignment Agreements.</u>

Township argues several of the Commission's findings are not supported by substantial evidence and/or do not support granting AW-PA the requested relief. First, Township argues the Commission's findings that the Broad Run Well will be an additional, alternate water supply source for AW-PA's customers that will inherently provide greater dependability are not supported by substantial evidence and do not establish an actual benefit to those customers. Similarly, Township contends having an alternate water supply source provides no benefit to AW-PA's

26

customers because AW-PA has sufficient water to support its customers' current needs. After reviewing the record, we conclude the Commission's findings are supported by substantial evidence and are legally sufficient to support the Commission's conclusion that AW-PA met its burdens of proof under the Code.

On the first affirmative public benefit found, the addition of an alternate water supply, AW-PA's evidence established, and Township does not dispute, that the Broad Run Well will be interconnected with AW-DE's water system. Although Township argues Broad Run Well would not be a source of water for AW-PA's customers, per the 2002 Affiliated Interest Agreement, AW-DE provides AW-PA with the potable water that AW-PA needs to serve its customers. Thus, the raw water that will flow into AW-DE's water system from the Broad Run Well will be available to AW-PA's customers in the same way that CWA constitutes a source of raw water for those customers. Notably, Township does not argue that CWA's water is unavailable to AW-PA's customers because it is combined with water from other sources in the AW-DE's water system and, in fact, relies on the availability of water from CWA as a basis for its arguments. Further, as the Broad Run Well will be a new water source that is being **added** to AW-DE's current sources, it is an additional, alternate water source of supply. Because a reasonable mind would accept the above evidence as sufficient to support the Commission's finding that the Broad Run Well will be an alternate source of water supply for AW-PA's customers, this finding is supported by substantial evidence.

We now turn to the Commission's finding that this alternate source of water supply will "inherently yield[] greater dependability for service to Pennsylvania customers." (Commission Op. at 80.) Township argues this inference is not substantial evidence that can support the Commission's finding of an affirmative

27

public benefit. However, it is well settled that the Commission's findings can be based on inferences that can be logically drawn from the record evidence and that this evidence and any inferences therefrom must be "viewed in the light most favorable to" "[t]he party [that] prevailed before the" Commission. *United Transp. Union*, 68 A.3d at 1032. Here, the Commission's finding, is supported by the record evidence. Mr. Spacht testified that there were times that water service from CWA was **unavailable** due to water quality and mechanical failures. (AW-PA Rebuttal Stmt. No. 1-R at 4, S.R.R. at 206b.) He explained that, because the CWA contract expires on "December 31, 2021, there was **no assurance** that such arrangement w[ould] continue, let alone be based on terms and pricing that are acceptable and mitigate potential future rate increases for [AW-PA's] customers." (AW-PA Rebuttal Stmt. No. 1-R at 5, S.R.R. at 207b (emphasis added).) As recognized by the ALJ and the Commission, "if the CWA-supplied water is problematic, there exists an alternative to obtain supplied water." (Commission Op. at 64.) Further, Mr. Spacht stated that the contract with CWA is "dynamic" and AW-PA thought it "prudent for [its] management to **look for the most cost-effective and reliable sources** to serve [its customers], **for now and the future,**" which "include[d] development of the Broad Run Well." (AW-PA Rebuttal Stmt. No. 1-R at 14-16, S.R.R. at 216b-17b (emphasis added).) Because a reasonable mind could find that a logical inference from this evidence would support a finding that adding an alternate water supply would inherently yield greater dependability for AW-PA's customers, the Commission's finding is supported by substantial evidence.

Township also argues that this reason is insufficient to be an affirmative public benefit because it is only a possible benefit and the current water supplies

28

are sufficient to meet AW-PA's current water supply needs. However, our Supreme Court has explained that the Commission is not required "to secure legally binding commitments or to quantify benefits" but to "make factually based determinations" applying the preponderance of the evidence standard. *Popowsky III*, 937 A.2d at 1057. As concluded above, the Commission's finding that the Broad Run Well will be an additional, alternate source of water that will inherently yield greater dependability is supported by substantial evidence, and, therefore, it is a "factually-based determination" that granting the requested relief will create an affirmative public benefit. That this benefit may not be quantified or guaranteed is not, per *Popowsky III*, a basis for rejecting the Commission's finding of an affirmative public benefit. Additionally, Township's arguments, essentially, would require AW-PA to wait until it was absolutely necessary for it to find an alternate source of water to meet its water supply needs. But, a utility is not required to prove absolute necessity for the proposed action to be approved. *Hess*, 107 A.3d at 262. Finally, to the extent Township's argument may be read as arguing AW-PA should find ways other than developing the Broad Run Well to meet its water supply needs, the Commission has determined that such decision falls within AW-PA's discretion on how it manages its business, which is not to be micromanaged by the Commission; we cannot disagree. *Phila. Elec. Co.*, 460 A.2d at 737-38. Thus, that AW-PA is being proactive and not waiting until its water supply needs are threatened does not mean that the Commission cannot find AW-PA has met its burdens of proof under the Code.

Township also challenges the Commission's finding that the creation of a new revenue stream for AW-PA, which could mitigate future potential rate increases for AW-PA's customers, was insufficient for granting relief. Township

29

argues that the potential rate mitigation is not an affirmative public benefit because AW-PA will not guarantee that benefit and the absence of an adverse effect is not an affirmative public benefit. Township does not assert that this finding is not supported by substantial evidence, nor could it reasonably do so because Mr. Spacht testified as to the creation of the new revenue stream and the intent to use it as mitigating future potential rate increases for AW-PA's customers, (S.R.R. at 19b, 207b-09b, 219b); rather, Township challenges the legal significance of that finding. With regard to Township's criticism that AW-PA would not provide a guarantee, as noted above, the Commission is not required to "secure legally binding commitments" in order to grant a certificate of public convenience. *Popowsky III*, 937 A.2d at 1057. Thus, the Commission's not requiring AW-PA to make guarantees does not warrant reversal of the Commission's decision.

Township also argues that the mitigation of future potential rate increases is insufficient because it constitutes an absence of an adverse effect not an affirmative public benefit. Prior to *City of York*, the standard used was that the Commission should approve a certificate of public convenience[8] "unless it is established, by competent evidence, that the [transaction] will adversely affect the public in some substantial way." *City of York*, 295 A.2d at 828 (internal quotation marks omitted). Recognizing that this standard was not consistent with the statutory standard, the Supreme Court held that, in order to obtain a certificate of public convenience, a utility would have to "demonstrate more than the mere

---

[8] *City of York* involved Sections 202 and 203 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *formerly* 66 P.S. §§ 1122, 1123, repealed by Act of July 1, 1978, P.L. 598, which were repealed and replaced by Sections 1102 and 1103 of the Code. The relevant language of former Sections 202 and 203 and current Sections 1102 and 1103 are nearly identical.

absence of any adverse effect upon the public" but would have to demonstrate that there would be an affirmative public benefit resulting from the transaction. *Id.* The Supreme Court reconfirmed and applied this standard in *Popowsky III*.

Here, Township argues that the potential mitigating effect on AW-PA's customers' future rates as a result of the new revenue stream created by the Well and Water Services Agreement should not be considered an affirmative public benefit. However, it is apparent from the Supreme Court's decisions in *City of York* and *Popowsky III* that a consideration of the effect on rates by a transaction under Section 1102(a) is a component of determining whether there is an affirmative public benefit. In *City of York*, one of the arguments on appeal was that the Commission "refused to consider the potential effect of the proposed merger upon the rates to be paid by consumers," which the appellants argued would be higher. 295 A.2d at 829. The Supreme Court agreed with the appellants "that the Commission **should consider, at least in a general fashion, the effect that a proposed [transaction] is likely to have on future rates to consumers**," and that "the **probable** general effect . . . is certainly relevant criteria of whether the [transaction] will benefit the public." *Id.* (emphasis added). The Supreme Court found in that case, that "the Commission did not flatly refuse to consider the effect . . . upon rates, but merely found that [the appellants] had produced no evidence that [there] would [be] any detrimental effect upon rates." *Id.* Relying on this discussion, the Supreme Court in *Popowsky III* stated that, "on its face," *City of York* "**requires consideration of rates** 'at least in a general fashion,' or the 'probable general effect . . . upon rates' . . . **as a component of a net benefits assessment**." *Popowsky III*, 937 A.2d at 1056 (quoting *City of York*, 295 A.2d at 829) (emphasis added). Because the affirmative public benefit test established in

*City of York* and confirmed in *Popowsky* "requires [the] consideration of rates 'at least in a general fashion[]' or the 'probable general effect . . . upon rates,'" *id.*, we discern no error in the Commission considering the probable effect the transactions here will have on AW-PA's customers' rates, which is a positive one, in determining that AW-PA met its burdens of proof under the Code.

The Commission, exercising its discretion on a matter that falls within its expertise, decided that granting AW-PA a certificate of public convenience and approving the Assignment Agreements, respectively, created affirmative public benefits for AW-PA's customers and was in the public interest. As this decision is supported by substantial evidence, we will not "substitute [our] judgment for that of the [Commission]." *Energy Conservation Council of Pa.*, 995 A.2d at 478 (quoting *Popowsky I*, 706 A.2d at 1201). Accordingly, these are not reasons to overturn the Commission's decision.

3. <u>Whether the Commission Impermissibly Considered and Relied on Benefits to Non-Pennsylvania Customers in Granting the Certificate of Public Convenience and Approving the Assignment Agreements.</u>

We turn now to Township's contention that the Commission erred in considering and relying on the benefits to out-of-state customers to conclude that AW-PA met its burden of proof, which is not supported by either *Middletown Township* or *Popowsky III*. In *Middletown Township*, the Commission denied a certificate of public convenience to Middletown Township, which operated a municipal water company and sought to acquire part of the water facilities of a water company that was located within Middletown Township. After "considering the interests of all affected parties," the Commission concluded that although the acquisition would benefit Middletown Township's present customers and the water company's customers located in Middletown Township, the approval would have

adverse effects on the water company's remaining customers. *Middletown Twp.*, 482 A.2d at 679. Therefore, the Commission concluded that the acquisition "did not affirmatively promote the service, accommodation, convenience, or safety of the public in any substantial way." *Id.* This Court affirmed, stating that "when the 'public interest' is considered, it is contemplated that the benefits and detriments of the acquisition be measured as they impact on ***all affected parties***, and **not merely on one particular group or geographic subdivision** as might have occurred in this case." *Id.* at 682 (bold emphasis added). While this decision referenced consideration of the impact on all affected parties, including outside a particular "geographic subdivision," *id.*, language that AW-PA contends allows for the consideration of the benefits to out-of-state consumers, *Middletown Township* involved the consideration of the effects on customers within **Pennsylvania**, not, as here, effects on customers outside of Pennsylvania. Thus, *Middletown Township* is of little assistance in deciding the issue before us.

In *Popowsky III*, the Office of Consumer Advocate (OCA) challenged the Commission's approval of the merger of Verizon and MCI and the decision not to impose conditions beyond those imposed by various federal agencies. OCA argued, among other things, that the Commission had not performed a Pennsylvania-specific analysis as to the benefits of the proposed merger but had relied on the nationally-based benefits and assessments of the merger by various federal agencies, an argument with which this Court agreed in its decision reversing the Commission's approval. *Popowsky III*, 937 A.2d at 1051. On further appeal, the Supreme Court disagreed with this Court's conclusion that the Commission did not perform a Pennsylvania-specific evaluation of the merger's effect. *Id.* at 1057 n.20. After noting that the Commission's decision "ma[de] it

33

clear that its evaluation was centered on [the] impact within the Commonwealth," *id.*, the Supreme Court "disapprove[d] the notion that the Commission should be foreclosed from accepting noted advantages as benefits pertaining in the Commonwealth on a developed Pennsylvania-specific record merely because they also pertain nationally," *id.* at 1061.

Reviewing the Commission's decision as a whole, it is apparent the Commission performed a Pennsylvania-specific inquiry and found affirmative public benefits for AW-PA's Pennsylvania customers from this transaction. The Commission expressly found that: "the Broad Run Well would be an alternate source of supply to **AW-PA's Pennsylvania customers** which inherently yields greater reliability of service"; there would be "benefits of the Broad Run Well and the Assignment Agreements to **customers in both Pennsylvania** and Delaware"; "the [Broad Run] Well, as an additional and [alternate] water supply source, will inure to adequate and reliable service to *Pennsylvania customers specifically*"; and "the potential mitigating effect on future customer rate increases" due to AW-PA's obtaining a new revenue stream through the Well and Water Services Agreement "demonstrates an affirmative public benefit to **AW-PA's customers**." (Commission Op. at 80-82 (italicized emphasis in the original, bold emphasis added).) Each of these statements reflects the Commission's findings that granting the requested relief would result in affirmative public benefits to **Pennsylvania** customers. And, although Township argues that these findings are not supported by substantial evidence and/or are insufficient to meet AW-PA's burdens of proof, we have concluded otherwise as set forth above. Accordingly, the Commission did perform a Pennsylvania-specific inquiry as required by *Popowsky III*, and this is not a reason to overturn the Commission's decision.

34

As for the Commission's references to the benefits to AW-DE's Delaware customers and the DRBC's water allocation approvals, such references were not legal error and did not represent, as Township argues, an "abdicat[ion]" of the Commission's legal obligations under the Code. (Township's Reply Br. at 12.) Per *Popowsky III*, the Commission is **not** "foreclosed from accepting the noted advantages as benefits pertaining in the Commonwealth on a developed Pennsylvania-specific record merely because they also pertain" outside of Pennsylvania. 937 A.2d at 1061. Further, in *Dunk v. Pennsylvania Public Utility Commission*, 232 A.2d 231, 234 (Pa. Super. 1967), a challenge to a public electric utility's use of eminent domain to construct a new power line, which the Commission cited in its opinion here, (Commission Op. at 12, 80 n.15), the Superior Court observed that the fact that utilities outside Pennsylvania may benefit because the line interconnected with a bulk power transmission system was "purely incidental to the corporate use contemplated" by the Pennsylvania public utility, which benefited Pennsylvania customers. Because the new power line was for the Pennsylvania public utility's corporate use, the Superior Court affirmed the Commission's determination that approving the new line was in the public convenience and necessity, notwithstanding that non-Pennsylvania utilities and their customers would also benefit. *Dunk*, 232 A.2d at 234. Here, notwithstanding that a non-Pennsylvania utility, AW-DE, and its customers will benefit from the transaction, this does not negate the affirmative public benefit to AW-PA's customers. Accordingly, the Commission's references to the benefits the transaction will have on Delaware customers and to the DRBC's water allocation approvals do not negate the Commission's Pennsylvania-specific inquiry and Pennsylvania-specific findings of affirmative public benefits to AW-PA's

customers. Consequently, this is not a reason to overturn the Commission's decision.

## III. Conclusion

For the foregoing reasons, we conclude the Commission's findings of fact and conclusions are supported by substantial evidence and support the grant of the certificate of public convenience and approval of the Assignment Agreements. We further conclude the Commission performed a Pennsylvania-specific inquiry as to whether AW-PA met its burdens of proof under the Code and did not err in recognizing that, in addition to the benefits to AW-PA's Pennsylvania customers, AW-DE's Delaware customers would also benefit from the approval of the Assignment Agreements. Accordingly, we affirm.

_____

**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

New Garden Township,
                    Petitioner

          v.

Pennsylvania Public Utility
Commission,
                    Respondent

:
:
:
:
:
:
:
:
:
:

No. 1360 C.D. 2019

## **O R D E R**

**NOW**, October 14, 2020, the Order of the Pennsylvania Public Utility Commission, entered in the above-captioned matter, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** Judge